814

GEORGE C. MARTIN AND GERALDINE L. MARTIN,
PETITIONERS v. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

RICHARD T. BICK AND JEAN BICK, PETITIONERS v.
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 1632-88, 2168-88.          Filed June 18, 1991.

*Richard C. Hite, Dennis V. Lacey, David S. Elkouri,* and
*Eric S. Namee,* for the petitioners at docket No. 1632-88.
  *David S. Elkouri* and *Eric S. Namee,* for the petitioners at
docket No. 2168-88.
  *C. Glenn McLoughlin* and *David Albert Mustone,* for the
respondent.

GERBER, *Judge:* Respondent determined a deficiency in
petitioners George C. Martin and Geraldine L. Martin's
1981 Federal income tax in the amount of $372,508.89.
Respondent determined a deficiency in petitioners Richard

T. Bick and Jean Bick's 1981 Federal income tax in the amount of $592,008 and a $29,600.40 addition to tax under section 6653(a)(1),[1] plus an additional amount equal to 50 percent of the interest due on $207,505 under section 6653(a)(2).

After concessions, the deficiencies remaining in dispute are solely attributable to respondent's determination that petitioners are in constructive receipt of benefits under a nonqualified deferred compensation plan. We consider here circumstances where petitioner husbands had the option to elect to receive a lump-sum distribution or 10 installment payments of their vested deferred compensation benefits upon termination of their employment. Both petitioner husbands chose installment payments and subsequently terminated their employment. Respondent determined that there was constructive receipt because petitioner husbands had a choice between lump-sum and installment benefits. This is an issue of first impression.

## FINDINGS OF FACT

The stipulation of facts and attached exhibits are incorporated herein by reference. The basic facts are not in dispute. These cases are consolidated for purposes of trial, briefing, and opinion.

Petitioners George C. Martin and Geraldine L. Martin ("Martin" when used in the singular refers to George C. Martin), cash basis taxpayers, were husband and wife during 1981, and they filed a joint 1981 Federal income tax return. At the time their petition in this case was filed, the Martins resided in Oklahoma City, Oklahoma.

Petitioners[2] Richard T. Bick and Jean Bick ("Bick" when used in the singular refers to Richard T. Bick), cash basis taxpayers, were husband and wife during 1981, and they filed a joint 1981 Federal income tax return with the Internal Revenue Service in Austin, Texas. At the time

---

[1] Section references are to the Internal Revenue Code of 1954 as amended and in effect for the taxable year in issue. Rule references are to this Court's Rules of Practice and Procedure. The addition to tax shown in connection with the Bicks is not attributable to the adjustment which is in controversy and decided in this opinion.

[2] References hereafter to "petitioners" are to petitioners George C. Martin and Richard T. Bick.

their petition in this case was filed, the Bicks maintained separate residences in Andover, Kansas.

Martin and Bick were long-term key management employees of Koch Industries, Inc. (Koch). During 1935, Martin began his employment with Koch's predecessor, Rock Island Oil & Refining, as a laborer and eventually became senior vice president of Koch. Prior to Martin's termination of employment, he was given the title of special consultant. During 1963, Bick began his employment with Rock Island Oil & Refining as the manager of the production department. Subsequently, Bick became vice president of Koch and president of its wholly owned subsidiary, Koch Exploration.

Koch is a privately owned Kansas corporation doing business primarily in the oil and gas industry. Koch has domestic and foreign oil and gas interests and operations. The oil and gas industry is subject to the risk of drastic changes in the market prices of crude oil. Sometimes these changes are caused by the mandate of OPEC (Organization of Petroleum Exporting Countries).

During the late 1960s and early 1970s, Koch created "management profit sharing units" for key management employees pursuant to a newly formulated deferred compensation plan (old plan). Under old plan, key management employees entered into separate agreements with Koch and received management profit-sharing units representing hypothetical shares of its common stock. The value of these units was dependent upon Koch's profits or losses. Each participating employee received units equal in value to the consolidated net income or loss per share of common stock for the period the units were held, less dividends per common share declared and paid during the same period. The units provided the participants with a valuable right to share in future dividends and future corporate earnings without risking their own capital, but the units issued were without other uses or value (i.e., were not transferable or negotiable). Martin and Bick were participants in old plan and had entered into individual deferred compensation agreements with Koch reflecting their participation. Koch issued Martin and Bick the following units under their respective individual deferred compensation agreements:

| Participant | Date shares awarded | Shares issued |
|---|---|---|
| Martin | Apr. 1, 1971 | 4,500 |
| | Jun. 21, 1972 | 500 |
| | Aug. 21, 1973 | 300 |
| | Oct. 15, 1974 | 300 |
| | Dec. 1974 | 280 |
| | Oct. 28, 1975 | 520 |
| | Nov. 1, 1976 | 600 |
| | Total | 7,000 |
| Bick | Apr. 1, 1971 | 5,000 |
| | Dec. 21, 1972 | 2,000 |
| | Dec. 11, 1974 | 3,000 |
| | Dec. 1974 | 350 |
| | Dec. 1, 1978 | 650 |
| | Dec. 5, 1980 | 500 |
| | Total | 11,500 |

Under the terms of old plan, computation of the amount of net income or loss attributable to one unit was to be made as of the end of Koch's fiscal year and upon the last day of the calendar month which immediately preceded the participant's "benefit computation date." The benefit computation date was defined as the date on which the participant terminated employment with Koch, or with respect to any units surrendered, the date of such surrender. Under old plan, a participant's benefits were only payable in 10 equal annual installments which did not bear interest. No other form of payment was available.

Koch, attempting to improve old plan, adopted a shadow stock plan (new plan)[3] on May 1, 1981, and submitted it to participating employees of old plan. New plan was drafted following an attempt by a 49-percent minority shareholder group to remove Koch's management. Koch's existing management became concerned that a change in management could affect its individual deferred compensation agreements. Additionally, new plan was drafted to resolve concerns over possible nonuniform and unequal treatment of participants under old plan. New plan was administered by a shadow stock committee composed of Koch's chairman of the board of directors, its president, and its chief financial officer. Tom Carey, chief financial officer of Koch, conducted most of the day-to-day administration of new plan. New

---

[3]The new plan is set forth in appendix I of this opinion.

plan was unfunded and the participants possessed no security interests insuring payment of benefits. Any funds which may have been used to pay benefits under new plan were unsegregated and subject to Koch's general creditors' claims.

Significant changes made in new plan which were different from old plan were as follows:

(1) A single plan was substituted for the individual contracts which had previously governed the issuance of old plan units.

(2) Payment would be made in a lump sum unless the participant elected to receive payment in 10 annual installments.

(3) If participants elected to receive 10 annual installments, interest was to accrue on the unpaid balance.

New plan permitted old plan participants to elect into new plan by signing and returning documents affixed to new plan certificates. Participants electing into new plan were required to surrender their individual deferred compensation agreements. Any old plan units were to be exchanged for new plan shadow stock. New plan participants were also required to execute a beneficiary and settlement designation form at the time they elected into new plan. Participants designated beneficiaries and elected the form of payment on the beneficiary and settlement designation form. Under new plan, benefits would be paid in a lump sum unless the participant executed the beneficiary and settlement designation form and elected to receive payment of the shadow stock benefits in 10 equal annual installments. If a participant failed to execute and deliver the form as required, all payments due upon the participant's death were to be paid in a lump sum to the legal representative of the participant's probate estate.

Also under new plan, participants could change their beneficiaries by executing another beneficiary and settlement designation form. The ability to change the form of payment was not set forth in new plan, but had been authorized by the shadow stock committee. That committee had the authority to interpret, construe, and implement the provisions of new plan. The committee exercised its authority and issued procedures that a change in the form of

payment (from lump sum to installments or vice versa) would not be effective until the year following the year in which the change was elected.[4] The stated purpose for the 1-year delay was to avoid the application of the constructive-receipt doctrine. Under new plan, participants had no right to change any election of the form of payment after termination of employment with Koch. The participants in new plan were entitled to receive a cash payment per share of shadow stock equal to the cash dividend paid to holders of shares of common stock.

A participant who surrendered his shares of shadow stock under new plan would receive payment for the value of the surrendered shares on the first business day of the next month following the expiration of 60 days after the surrender date as defined in new plan. The value of each share of shadow stock as of the surrender date was the amount by which the cumulative earnings per share of Koch's common stock exceeded the cumulative losses and cash dividends paid per share of Koch's common stock for the period beginning on the first day of the year of the issue date and ending on the last day of the month preceding the surrender date. Increases in value were determined on an annual basis for each year the shadow stock was outstanding. If the surrender date fell between annual valuations, Koch's monthly statements were utilized to determine the excess of earnings over cash dividends and losses for each monthly period. Accordingly, the annual increments would become fixed on an annual basis, but any monthly increments may have been reduced by the subsequent month's losses or subsequent cash dividends.

To the extent that a participant was not 100-percent vested in shadow stock on the surrender date, the participant's rights in the unvested shares were forfeited. Once a participant surrendered his shadow stock, he could no longer participate in new plan and would not thereafter be entitled to share in Koch's future profits without investing and risking his own capital.

Martin elected to participate in new plan and his 7,000 old plan units were treated as shares of shadow stock under new plan. On July 16, 1981, Martin elected to receive his

---

[4]The relevant portions of these instructions are set forth in appendix II of this opinion.

shadow stock benefits in 10 equal annual installments. On August 1, 1981, Martin's employment with Koch was involuntarily terminated. Koch's president advised Martin of the termination approximately 1 week in advance of August 1, 1981. On September 1, 1981, Martin's shadow stock benefits were valued at $651,948.65. On October 1, 1981, Koch paid Martin the first annual installment in the amount of $65,194.87.

Bick also elected new plan participation and his 11,500 old plan units were treated as new plan shadow stock shares. On May 7, 1981, Bick elected to receive his shadow stock benefits in 10 equal annual installments. On August 31, 1981, Bick voluntarily terminated his employment with Koch. At the time Bick terminated employment with Koch, he was about 52 years old. Bick's voluntary termination was amicable. Following termination he served as a consultant to Koch for 1 year at his pretermination salary rate.

Bick resigned because he perceived that Koch had a lack of confidence in him. The perception arose after his May 7, 1981, election and in connection with a 10-year international project involving German and Qatar interests managed by Bick. During 1971, Koch formed a consortium, on Koch's behalf, with German companies seeking to secure a business concession in Qatar. After securing the concession, the consortium discovered "about 400 trillion [cubic feet of gas] reserves" (a significant quantity) in a single gas field. During the same time period, the consortium negotiated with Qatar regarding the formation of a joint venture to exploit the gas reserves. After several years, little progress had been made with these negotiations. In 1980, Koch employed Donald L. Cordes (Cordes) as vice president of legal affairs. Cordes decided that the consortium should take a stronger position with the Government of Qatar. The German partners, along with Bick, disagreed with this approach. Thereafter, Bick received notification that all new transmissions and correspondence with the German partners were to be cleared by the legal department and Cordes. Prior to this notification, Bick conducted all the operations involving the consortium and the Government of Qatar. Bick resigned on the same day he received the notification. When Bick resigned, his interest in some of the shadow

stock was not fully vested. On October 26, 1981, Bick's shadow stock benefits were valued at $844,614. Koch paid Bick the first annual installment in the amount of $84,461.40 on October 29, 1981.

## OPINION

We consider here whether petitioners were in constructive receipt of their entire shadow stock benefits. Specifically, we consider whether petitioners were in constructive receipt of their benefits at the time the lump-sum benefits option became available. We also consider whether petitioners were in constructive receipt of the benefits at the time they elected to receive installments. This is a question of first impression.

Respondent determined that Bick and Martin were in constructive receipt of their deferred compensation benefits because they had the unfettered right or choice, in 1981, to receive a lump-sum distribution after electing into new plan. Respondent argues that Bick and Martin's election to receive the 10 annual installments was both self-imposed and an insufficient restraint to preclude application of the doctrine of constructive receipt. Respondent concedes, however, that the mere ability of a plan participant to select among several distribution options upon entry into a nonqualified deferred compensation plan does not, per se, result in constructive receipt of benefits. Respondent argues that the aspect which triggers constructive receipt here is petitioners' unfettered choice or right to elect a lump sum or installments. More specifically, respondent argues that the constructive-receipt doctrine is triggered because the lump sum was available to petitioners.

Petitioners contend that no amount was constructively received by them prior to their surrender of the shadow stock shares. In support of their contention, petitioners point out that the amount of payment was not specifically or definitely ascertainable, was not "made available," and their right to surrender was subject to the following limitations and restrictions: (1) Forfeiture of the right to participate in future dividends declared by Koch; (2) forfeiture of the right to benefit from Koch's future equity growth without investing and risking their capital; (3)

forfeiture of the right to change the form of payment in subsequent years; and (4) in Bick's case, forfeiture of all cumulative profits previously allocated to the portion of his unvested shares.

Petitioners also contend that once the benefits became due and were ascertainable, their rights to payment of the deferred installments were restricted by their prior election which became irrevocable on the surrender dates. Finally, petitioners contend that the doctrine of constructive receipt is inapplicable because Koch's promise to pay deferred installments was unsecured and all future payments remained subject to the business fortunes, investment risks, and claims of the general creditors of Koch.

The determination of whether a taxpayer has constructively received income is to be resolved largely on a factual basis. *Hughes v. Commissioner,* 42 T.C. 1005, 1012 (1964). Here the controversy is dependent upon whether the facts support a holding that petitioners constructively received the benefits of the shadow stock plan in 1981 (when they could have opted for full payment of the benefits which would have been available at that time) or when they actually received each annual installment (which is the option they did choose). To decide whether either petitioner had "constructively received" the benefits in 1981, we first consider the nature of the cash method of accounting for income and the relationship of the doctrine of constructive receipt to that method.

A taxpayer reporting on the cash method of accounting must include an item in income for the taxable year in which such item is actually or constructively received. Sec. 451(a). The concept of constructive receipt has been addressed in court opinions for more than 50 years. Certain established principles have been used to address these issues. The seminal concept of these cases and one which this and other courts have embraced has been set forth in section 1.451-2(a), Income Tax Regs. See *Benes v. Commissioner,* 42 T.C. 358, 381 (1964), affd. 355 F.2d 929 (6th Cir. 1966); *Young Door Co., Eastern Division v. Commissioner,* 40 T.C. 890 (1963); *Gullett v. Commissioner,* 31 B.T.A. 1067, 1069 (1935). Section 1.451-2(a), Income Tax Regs., defines the term "constructive receipt" as follows:

(a) *General rule.* Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *

Under the constructive-receipt doctrine, a taxpayer recognizes income when the taxpayer has an unqualified, vested right to receive immediate payment. *Ross v. Commissioner,* 169 F.2d 483, 490 (1st Cir. 1948), revg. and remanding on another issue a Memorandum Opinion of this Court; *Amend v. Commissioner,* 13 T.C. 178, 185 (1949). The doctrine precludes the taxpayer from deliberately turning his back upon income otherwise available. *Young Door Co., Eastern Division v. Commissioner, supra* at 894; *Basila v. Commissioner,* 36 T.C. 111, 116 (1961); *Hamilton National Bank of Chattanooga v. Commissioner,* 29 B.T.A. 63, 67 (1933).

Some courts have distinguished situations where a taxpayer has an unqualified right to demand funds from those where a taxpayer has the authority or power to cause the receipt of funds. *Jerome Castree Interiors, Inc. v. Commissioner,* 64 T.C. 564, 570 (1975), affd. without published opinion 539 F.2d 714 (7th Cir. 1976); *Basila v. Commissioner, supra* at 117; *Gullett v. Commissioner, supra* at 1069.

On numerous occasions, this Court has addressed the question of when constructive receipt occurs. In situations where the taxpayer has entered into a binding contract or agreement to defer income before it is earned, the income is not includable in income by a cash basis taxpayer until it is received. *Robinson v. Commissioner,* 44 T.C. 20 (1965); *Oates v. Commissioner,* 18 T.C. 570 (1952), affd. 207 F.2d 711 (7th Cir. 1953). The rationale upon which this principle is based was thoughtfully set out in *Oliver v. Commissioner,* 193 F. Supp. 930, 933 (E.D. Ark. 1961), as follows:

[Where a taxpayer] acquires an unconditioned vested right to receive the proceeds of the sale, and the buyer is ready, willing, and able to make payment, the taxpayer cannot avoid treating the proceeds as income for that year by voluntarily declining to accept payment during that year, or by requesting the purchaser not to pay him until a later year, or even by

voluntarily putting himself under some legal disability or restriction with respect to payment. In such circumstances, he will be deemed in constructive receipt of the income notwithstanding his refusal to accept payment or his self-imposed restraints on payment.

On the other hand, * * * Where such a stipulation [deferring the receipt of income] is entered into between buyer and seller prior to the time when the seller has acquired an absolute and unconditional right to receive payment, and where the stipulation amounts to a binding contract between the parties so that the buyer has a legal right to refuse payment except in accordance with the terms of the agreement, then the doctrine of constructive receipt does not apply, and the taxpayer is not required to report the income until the same actually is received by him.

[Citations omitted.]

This principle applies "notwithstanding that the obligor might have been willing to contract to make such payments at an earlier time." *Robinson v. Commissioner, supra* at 36.

Similarly, it has been held that the constructive-receipt doctrine does not apply where the taxpayer elects to further defer income by entering into a superseding contract so long as the amounts are not yet due. *Veit v. Commissioner,* 8 T.C. 809, 818 (1947); *Kimbell v. Commissioner,* 41 B.T.A. 940 (1940). In *Veit,* the taxpayer agreed at the beginning of 1939 to receive 10 percent of his employer's net profits for 1939 and 1940, to be paid on two dates in 1941. In November 1940, the taxpayer and his employer entered into a new contract and further deferred his share of the 1940 profits to 1942. In holding that the deferred income was not constructively received, it was stated that "there was an agreement to pay at a particular time indefinite amounts, and, prior to the date on which those amounts were due or could be determined, payment was deferred." *Veit v. Commissioner, supra* at 818. Thus, there is no constructive receipt of income where an agreement under which the taxpayer would have received deferred payments from his employer was superseded by a bona fide later agreement.

There are no cases which directly address the issue under consideration. Here we consider whether either the addition or availability of the lump-sum option resulted in constructive receipt even though an installment option was elected. Respondent's primary argument is that petitioners had an unqualified right to receive a lump-sum distribution under new plan resulting in the constructive receipt upon the termination of their employment. More specifically, respon-

dent contends that petitioners acquired the right to accelerate the receipt of benefits under new plan.

In order to apply the precedent and criteria of the regulations and cases concerning constructive receipt, we have considered the following factors, which are not exclusive[5] or necessarily individually determinative: (1) Whether the plan was funded; (2) whether the participant's right under, and interest in, the plan was secured; (3) whether the election could only be made before the amounts became due and/or ascertainable; (4) whether the participant's right to receive income was subject to substantial limitations or restrictions; and (5) whether interest was payable on installment payments and when interest, if any, accrued.

The facts and circumstances of this case do not justify the application of the constructive-receipt doctrine. Initially, we note that the shadow stock plan was unfunded and the participants had an unsecured right under, and interest in, the plan. See *Robinson v. Commissioner*, 44 T.C. at 37. Petitioners' rights were similar to those of unsecured creditors, but only to the extent that an installment became due. If Koch had been petitioned into bankruptcy, petitioners would have fared no better than any other unsecured creditor. Accordingly, the election to spread the benefits here subjects the payment of remaining benefits to an element of risk. There was no showing or controversy here as to Koch's financial ability or inability to pay future benefits. But such facts could have been relevant.

The election to receive either a lump-sum distribution or installment payments could only be made before the amounts became due and fully ascertainable. Under new plan, benefits were not due or payable until the surrender date. The surrender date includes the date on which participants surrender their shadow stock shares for redemption. Participants could surrender all or part of their vested shares of shadow stock for a formulated value prior

---

[5]For example, it might be appropriate to consider whether any participant had an ownership interest or control over the corporate entity and its shadow stock plan. If some form of ownership or control existed, it might be appropriate to more closely scrutinize the terms and arrangements of the plan. In the shadow stock setting, however, it is less likely and probably more suspicious for employees with substantial equity and control to be receiving shadow stock benefits which are intended to permit key employees to share in profits without investing and risking their capital. In this case, petitioners were employees and apparently had inconsequential or little equity in the corporate entity.

to terminating employment with Koch and were required to surrender all shares upon terminating employment. Under new plan, once a mode of payment was elected, a change in payment mode would not be effective until the year after the requested change. Because petitioners were limited to making the election prior to the surrender date, they did not acquire an unconditional right to receive payment prior to their respective surrender dates. Accordingly, the full amount of petitioners' shadow stock benefits was not due or payable upon terminating employment in 1981 because petitioners had elected to receive installment payments.[6] The installment elections were made before petitioners acquired an unconditional right to receive payment of their benefits. Respondent places great emphasis on the point that petitioners had the right to obtain a lump-sum distribution prior to electing to receive installment payments but fails to recognize that the lump sum was not due until petitioners surrendered their shadow stock shares.

Respondent argues that petitioners' benefits were determinable at any time under the terms of new plan and that the benefits could be calculated monthly. This aspect is of less significance but must be considered due to its relationship to the "availability" of the benefits concept. If it is determined that benefits are unascertainable, that fact would have some bearing upon whether benefits were technically available prior to the tender or surrender of the shadow stock interest. Under the terms of new plan, the value of each shadow stock share equaled the excess of the cumulative earnings per share of Koch's common stock over cumulative losses and cash dividends paid per share of Koch's common stock for the period beginning on the first day of the year of the issue date and ending on the last day of the month preceding the surrender date.

Petitioners argue that the amount is not ascertainable until a surrender date is chosen because the monthly increments, if any, would not otherwise be available to participants. This is so because the potential benefits are determined on an annualized basis until surrender. If

---

[6]We note that this is not a situation where petitioners are reinvesting benefits which have become due in the hopes of obtaining greater appreciation or a higher yield on their shadow stock equity.

surrender occurs more than 1 month from the end of the normal accounting year, then monthly increments, if any, come into play. On July 31, 1981, the last day of the month preceding Martin's surrender date, the cumulative earnings per share were $14.99. At the time of Bick's surrender date on August 31, 1981, the cumulative earnings per share were $17.46. Thus, there was an increase in the cumulative earnings per share of approximately $2.50 from July 31, 1981, to August 31, 1981. Although we agree with respondent that the annual portions are determinable and become relatively fixed or determined in amount, the total benefits or value attributable to the shadow stock is not subject to precise determination until the surrender date. This is due to the potential for monthly fluctuations in the value of the cumulative earnings per share. Accordingly, the amount of benefits or the value of the shadow stock is roughly ascertainable, but not subject to precise determination except on an annual basis.

Respondent argues that at the time of the exchange of old plan certificates for new plan shadow stock, petitioners acquired an unfettered right to lump-sum benefits and hence, at the time of surrender, had constructively received income. Petitioners counter that, regardless of whether they acquired the right at the time of the exchange or had the continuing right thereafter, they were required to elect prior to the surrender and notify Koch of their election to receive benefits. Respondent directs us to the language of the regulation and respondent's position in Revenue Ruling 72-317, 1972-1 C.B. 128, to the effect that the requirement of notice is not considered a restriction on the receipt of income within the meaning of section 1.451-2(a), Income Tax Regs.

Our reading of the regulation is that the notice is not restrictive where "Income * * * is credited to * * * [the taxpayer's] account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year." Sec. 1.451-2(a), Income Tax Regs. It appears that petitioners possessed the right to a lump-sum payment upon surrendering their shares of shadow stock from the inception of new plan. At the time they exchanged their old plan

units for new plan shadow stock, they could have surrendered the stock for a lump sum or elected installments and surrendered their stock for 10 annual installments. However, the facts of this case reflect that petitioners had to give up or forfeit certain rights and future benefits in exchange for current or installment benefits. Hence, petitioners' rights to receive income were subject to limitations and restrictions. This situation is different from having the amount credited, set apart, and made available. It is this difference which, in large part, makes the situation here one which does not result in constructive receipt.

Petitioners could obtain payment of their benefits only by: Forfeiting the right to receive future contributions of shadow stock by Koch; forfeiting the right to benefit from Koch's future equity growth without risking actual capital; forfeiting the right to future payment based upon common stock dividends; and, regarding Bick, forfeiting all cumulative profits previously allocated to his unvested shares. It has been held that the forfeiture of the right to receive employer contributions may represent a substantial limitation or restriction, thereby preventing application of the constructive-receipt doctrine. See *Knapp v. Commissioner,* 41 B.T.A. 23 (1940). In *Knapp,* the taxpayer was a participant in a savings and profit-sharing fund in which his employer made contributions to his account. A participant who had completed 10 years of service could withdraw the full amount credited to his account. However, once a participant withdrew his funds, he would no longer participate in the fund. When the taxpayer terminated his employment, the amounts credited to his account were distributed to him. In holding the doctrine of constructive receipt inapplicable, it was concluded that the forfeiture of the taxpayer's right to receive employer contributions was a substantial limitation or restriction on the taxpayer's right to demand payment. *Knapp v. Commissioner, supra* at 27.

Similarly, in *Estate of Hales v. Commissioner,* 40 B.T.A. 1245 (1939), it was held that forfeiture of the right to participate in the earnings of a business represents a substantial limitation or restriction. In *Hales,* the taxpayers could have received the income in question only by surrendering their stock in a corporate enterprise, withdrawing

their entire investment, and losing their right to participate in the earnings of the business. The Board of Tax Appeals found this loss to be a valuable right sufficient to render inapplicable the doctrine of constructive receipt. *Estate of Hales v. Commissioner, supra* at 1248.

Finally, although interest was payable to petitioners on the unpaid balance of their shadow stock benefits, the interest was payable on the unpaid balance only after the first installment date. Thus, no interest accrued prior to petitioners' surrender of shadow stock and receipt of their first installments. Because no interest accrued prior to surrender and receipt of the first installment, this factor is inconsistent with respondent's position concerning constructive receipt. Cf. *Kaw Dehydrating Co. v. Commissioner,* 74 T.C. 370, 376 (1980) (lack of interest accruing on bonuses did not support taxpayer's contention in support of constructive receipt).

In summary, petitioners had the choice or right to receive a lump sum or installment benefits. The choice or right was not sufficiently unfettered to cause constructive receipt. Although respondent admits that the choice (with respect to a new plan or new employee) to receive a lump sum or installments upon entry into a plan does not result in constructive receipt, he argues that constructive receipt occurs in the year benefits are sought if a taxpayer has a choice before electing to receive benefits. Respondent's position is somewhat flawed in a sophistical sense because the logical extension of his position would result in constructive receipt upon the event of any vesting of participants' interests if they could have elected lump-sum benefits without any restriction. We think respondent has not placed sufficient emphasis or consideration upon the purpose and intent of a shadow stock plan—to permit key employees to share in any future success of the business. That aspect is significant because a participant must give up that right to receive benefits. Also, petitioners had no security for future payment. Moreover, the time restriction upon changing their election, which petitioners were required to make prior to activating receipt of benefits in any form, has the effect of countering respondent's position and theory.

We do not rule out the possibility that the circumstances of a shadow stock plan could result in constructive receipt prior to actual receipt of all benefits, but that does not appear to be the case here. The benefits in this case, although available, were not yet credited, set apart, or made available so that petitioners could draw upon them. There was something of substance and import which had to be done or given up to render the benefits as constructively received. We also note that in addition to petitioners' qualified rights, their relationship and agreement with Koch was bona fide and at arm's length. See *Amend v. Commissioner*, 13 T.C. 178, 185 (1949). Under the circumstances, we hold that petitioners did not constructively receive the entire amount of their shadow stock benefits in 1981. The shadow stock benefits are includable in income in the taxable years in which benefits are paid to petitioners.[7]

To reflect the foregoing,

> *Decision will be entered for the petitioners in docket No. 1632-88.*
>
> *Decision will be entered under Rule 155 in docket No. 2168-88.*

---

## APPENDIX I

### KOCH INDUSTRIES, INC.
### SHADOW STOCK PLAN

W I T N E S E T H: That,

WHEREAS, Koch Industries, Inc. (the "Company") has heretofore maintained a plan or policy pursuant to which Units equivalent to shares of the Company's common stock were granted from time to time to selected key employees of the Company and its subsidiaries, which Units entitled the affected employees to deferred compensation measured by the earnings of the Company's shares of common stock and payable at such times, in such manner, and under such circumstances as were set forth in individual contracts entered into between the Company and each of the affected employees; and

---

[7]In holding for petitioners, we have not relied on Technical Advice Memorandum 8632003 (Apr. 18, 1986), which we found irrelevant to the disposition of the issues in this case. See *Knapp v. Commissioner*, 90 T.C. 430, 438 n.5 (1988), affd. 867 F.2d 749 (2d Cir. 1989).

WHEREAS, the Company desires to continue the aforesaid plan and policy with, however, certain changes in both the format and certain substantive terms;

NOW, THEREFORE, the Company hereby adopts this plan, to be known as the "Koch Industries Shadow Stock Plan", and to be administered and governed by the following terms and provisions.

## ARTICLE I

### Purpose of the Plan

The purpose of this plan is to provide an incentive to, and a reward for, certain key employees (selected as hereinafter set forth) of the Company and its majority owned subsidiaries by the granting to such employees of the right (subject to all the terms and provisions of this plan) to participate in future earnings of the Company, the same as if such employees were the owners of that number of shares of the Company's common stock as are equal to the number of units (hereinafter referred to as "shares of Shadow Stock") assigned to such employees under the Certificates issued hereunder and pursuant to the terms hereof. It is expressly understood that neither the adoption of this plan nor the issuance of any Certificates hereunder shall be construed as entitling any employee to any continued employment rights or to the rights of a stockholder in the Company, it being the intention hereof only to adopt a plan of incentive deferred compensation and to measure such compensation by the earnings of the Company, all as hereinafter more fully set forth, but to in no other respect alter the relationship between the Company, its subsidiaries and the selected key employees to one other than that of employer/employee.

## ARTICLE II

### Eligible Recipients of Shadow Stock

No person shall be entitled to receive a grant of shares of Shadow Stock under the terms of this plan unless such person (a) is an employee of the Company or of a majority owned subsidiary of the Company, and (b) has been determined by the Shadow Stock Committee to be a key employee of the Company and/or its majority owned subsidiaries.

## ARTICLE III

### Administration of Plan

This plan shall be administered by a committee (the "Shadow Stock Committee") comprised of the Chairman of the Board of Directors of the Company, the President of the Company and the chief financial officer of the Company. The Shadow Stock Committee shall have full power, authority and responsibility to administer this plan, to select from time to time the key employees to whom shares of Shadow Stock should be granted, to determine the number of shares of Shadow Stock to issue, to

interpret, construe and implement the provisions of this plan. All decisions by the Shadow Stock Committee shall be by majority vote and, when so made and signified in a written instrument signed or initialed by a majority, shall be binding upon the Company and all affected employees. The Chairman of the Board of Directors of the Company or his designee shall have the authority to execute Certificates awarding shares of Shadow Stock to key employees selected by the Committee and to do and perform such other tasks under terms of this plan as may be determined from time to time by the Committee. Any employee may rely absolutely upon the act and signature of the Chairman or his designee as being duly authorized and shall not be obligated or privileged to inquire as to such authority.

## ARTICLE IV

### Grant of Shares of Shadow Stock; Beneficiary Designation

No grant of shares of Shadow Stock shall be valid and binding unless and until it is evidenced by a certificate (the "Certificate") executed by the Chairman of the Board of Directors of the Company or his designee (which may be facsimile). If, after the date on which a Certificate is issued (the "Issue Date"), the number of outstanding shares of the Company's common stock shall be adjusted by stock dividend, stock split, combination of shares or other similar capital adjustment, the number of shares of Shadow Stock shall be adjusted in a corresponding manner.

At the time a Certificate is issued to an employee as aforesaid, such employee shall also be requested to execute a designation of the person(s) or entity(ies) (the "Beneficiary(ies)") to whom the benefits due, if any, hereunder are to be paid upon the death of such employee. Such designation shall be in such form as may be prescribed by the Shadow Stock Committee and may be revoked and amended from time to time by the employee during the lifetime of the employee in such manner and on such form as may be prescribed by the Shadow Stock Committee. In the event an employee becomes deceased without having a Beneficiary designation as aforesaid in force or in the event no designated Beneficiary is alive or in being at the time of employee's death, all payments due hereunder upon the death of such employee shall be paid to the legal representative of the probate estate of such deceased employee.

## ARTICLE V

### Surrender of Certificate

1. *Termination of employment.* As and when the employment of any employee is terminated, whether such termination is voluntary or involuntary, with or without cause, and whether due to death, disability or other cause, all Certificates evidencing shares of Shadow Stock issued to such employee hereunder shall automatically and instantaneously be terminated, and such Certificates shall thereupon be forthwith surren-

dered to the Shadow Stock Committee, whereupon such employee or the Beneficiaries of such employee shall be entitled to payment for the Vested shares of Shadow Stock in the amounts and payable in the manner as set forth in ARTICLE VII hereof; *provided, however,* that if the Shadow Stock Committee determines that the termination of employment of an employee is temporary and that such employee should be considered to be on a leave of absence, then, and in such event, no termination of employment will be deemed to have occurred for purposes hereof until the expiration of such leave of absence period, as determined by the Shadow Stock Committee, whereupon such termination will occur unless active employment is then resumed. For all purposes hereof, termination of employment shall not be deemed to have occurred until such time as the employee is no longer employed by the Company or any of its majority owned subsidiaries.

2. *Voluntary surrender.* An employee, while still in the employment of the Company or any of its majority owned subsidiaries, may voluntarily surrender all or any portion of the shares of Shadow Stock in which such employee is Vested, as determined under paragraph "3" of ARTICLE VII, and to receive therefor the value of such surrendered Vested shares as determined and in the manner as set forth in ARTICLE VII. Such surrender shall be manifested by a physical delivery to the Shadow Stock Committee of the Certificate or Certificates evidencing the shares of Shadow Stock to be surrendered, coupled with a written statement signed by the employee expressing the number of shares of Shadow Stock which such employee desires to surrender; whereupon such employee shall be entitled to payment for such surrendered shares of Shadow Stock and to reissue of a Certificate evidencing the balance, if any, of the shares of Shadow Stock not so surrendered (which Certificate shall contain appropriate information indicating the original Issue Date and the original number of shares of Shadow Stock if and to the extent such information is necessary to determine future Vesting in the unvested shares, if any).

3. *Liquidation or merger.* All Certificates evidencing shares of Shadow Stock issued hereunder shall automatically and instantaneously be terminated and such Certificates shall thereupon be forthwith surrendered for redemption when

(a) the stockholders of the Company have adopted a plan of complete liquidation (other than such a plan which is a part of a plan of reorganization referred to in the following clause "(b)"), or

(b) the Company has effectuated a merger, consolidation or other transaction constituting a reorganization within the meaning of §368(a)(1)(A), (B), (C), or (D) of the Internal Revenue Code of 1954, as amended, with another corporation pursuant to which the Company's shares of common stock will be surrendered in exchange for the stock of another corporation (the "Surviving Corporation") without provision being made in the agreement for the continuation of this plan;

whereupon all persons holding Certificates for the shares of Shadow Stock hereunder shall be entitled to payment in the amount and in the

manner as determined under ARTICLE VII hereof. For purposes of clause "(b)" of the preceding sentence, a provision in an agreement of merger, consolidation or other transaction as set forth above will be considered a provision "for the continuation of this plan", and each employee holding Shadow Stock hereunder will be bound thereby, if such provision specifies that the Surviving Corporation will adopt this plan and that all shares of Shadow Stock issued under this plan will automatically be converted into shares of Shadow Stock of the plan of such Surviving Corporation on the same basis that the shares of the Company's common stock are converted and that in all other respects the rights of each employee in the Shadow Stock issued to such employee will continue in accordance with the terms hereof except that the phrase "the Company" will mean and refer to the Surviving Corporation from and after the effective date of such merger, consolidation or other transaction.

4. *Surrender Date; effect of lost Certificates.* For all purposes hereof, the "Surrender Date" shall mean (a) in the case of paragraph "1" the date of termination of employment as set forth in said paragraph "1", (b) in the case of paragraph "2" the date on which the required written statement is signed by the employee voluntarily surrendering the specified number of shares, and (c) in the case of paragraph "3" the date of the adoption of the plan of complete liquidation or the effective date of the described merger agreement. Except for the right to receive the payments, if any, as provided in ARTICLE VII, no further benefits or rights shall accrue to shares of Shadow Stock from and after the Surrender Date with respect to such shares regardless of when, if ever, the Certificates evidencing such shares are physically surrendered. In the event that on or after the Surrender Date the Certificate or Certificates evidencing such employee's shares of Shadow Stock to be surrendered has not been located and tendered for surrender, the Shadow Stock Committee may nonetheless authorize payment of the benefits, if any, due employee or employee's Beneficiary if such Committee is satisfied, in its sole discretion, either that such payment without the requisite surrender of the Certificate(s) would not expose the Company to any additional liability or that the Company is adequately indemnified against such liability.

## ARTICLE VI

### Dividends

Each holder of a Certificate(s) for Shadow Stock shall be entitled to receive a cash payment per share of Shadow Stock represented thereby, equal to any cash dividend per share paid to the holders of the Company's shares of common stock. Such payment shall be made at the same time as the payment of such dividend and shall be based upon the shares of Shadow Stock held by any person as of such record date, if, and only if, such shares are evidenced by a Certificate having an Issue Date prior to such record date and then only to the extent that a

Surrender Date has not occurred with reference to such shares prior to such record date.

## ARTICLE VII

### Payments upon Surrender of Certificates

1. *General.* On the first business day of the month next following the expiration of sixty (60) days after a Surrender Date (or at such later time as the Certificates are either physically surrendered or the Shadow Stock Committee waives such requirement), the Company shall pay, in the manner set forth in paragraph "4" hereof, to the employee whose shares of Shadow Stock are surrendered (or to the Beneficiaries of such employee) an amount equal to the value of the surrendered shares of Shadow Stock (as determined under paragraph "2" hereof) in which the employee is Vested (as determined under paragraph "3" hereof). To the extent an employee is not one hundred percent (100%) Vested (as determined under paragraph "3" hereof) as of the date of such employee's termination of employment (as defined in paragraph "1" of ARTICLE V), all of employees [sic] rights to the unvested shares of Shadow Stock shall be forfeited the same as if such shares had never been issued and neither employee or employee's Beneficiaries shall have any further claim thereto.

2. *Value of shares of Shadow Stock.* The value of each share of Shadow Stock as of the Surrender Date for such shares shall be the amount, if any, by which

(i) the cumulative earnings per share of the Company's common stock exceeds

(ii) the cumulative losses and cash dividends paid per share of the Company's common stock

for the period beginning on the first day of the year of the Issue Date and ending on the last day of the month preceding the Surrender Date, all as determined on a consolidated basis in accordance with generally accepted accounting principles consistently applied. In making the above determinations, the information reflected in the Company's annual audited financial statements and the notes thereto and, in the case of a Surrender Date occurring after January 31 of a year, in the applicable monthly financial statements prepared by the Company for internal use shall control and be binding, it being the intention hereof that no employee shall be privileged to inquire as to the propriety or accuracy of such information but that both Company and each employee shall be bound thereby. As soon as possible after the conclusion of each fiscal year of the Company, the Company's independent public accountants will make a report as to the earnings, losses and dividends for such year with respect to all shares of Shadow Stock outstanding as of the end of such year, which report shall then be communicated to the holders of the shares of Shadow Stock and which shall, thereupon, be final and conclusive as to the results for such year for all purposes, except, however, that any prior period adjustments included in subsequent

financial statements of the Company and approved by the Company's independent public accountants shall be similarly made to the computation of the value of all shares of Shadow Stock, except, however, for such shares which have terminated by reason of a Surrender Date prior to such restatement.

3. *Vesting.* Each employee shall be Vested in all of the shares of Shadow Stock evidenced by a Certificate or Certificates held by him if, as and when:

(a) such employee's employment with the Company and all of its majority owned subsidiaries is terminated by reason of the death or disability of such employee, and, for purposes hereof, an employee shall be considered to be disabled when, on the basis of medical evidence satisfactory to the Shadow Stock Committee, such employee is found to be wholly and permanently prevented from engaging in any occupation or employment as a result of bodily injury or disease, physical or mental;

(b) such employee has attained age sixty five (65) while still in the employment of Company or its majority owned subsidiaries; or

(c) the events described in paragraph "3(a)" and paragraph "3(b)" of ARTICLE V occur while employee is still in the employment of Company or its majority owned subsidiaries.

In all events other than those described above, the number of shares of Shadow Stock evidenced by a Certificate in which an employee is Vested shall be determined in accordance with the number of years of employment of such employee from the Issue Date of the Certificate evidencing such shares to the Surrender Date, as follows:

| *Number of years of employment from issue date to surrender date* | *Shares vested as a percent of total issued* |
|---|---|
| Less than 3 | 0% |
| 3 but less than 4 | 30% |
| 4 but less than 5 | 40% |
| 5 but less than 6 | 50% |
| 6 but less than 7 | 60% |
| 7 but less than 8 | 70% |
| 8 but less than 9 | 80% |
| 9 but less than 10 | 90% |
| 10 or more | 100% |

In the event an employee surrenders a Certificate pursuant to paragraph "2" of ARTICLE V at a time when such employee is not Vested in all of the shares represented by such Certificate, the schedule of vesting in the unvested portion of such shares shall continue the same as if such surrender had not taken place (e.g., an employee having a Certificate for 1,000 shares with an Issue Date of 1/10/81 who surrenders 300 shares under paragraph "2" of ARTICLE V in 1984 will be Vested in 100 of the 700 remaining shares on 1/10/85 if such employee remains in the Company's employment until such date).

4. *Manner of payment.* The amount to which an employee or Beneficiary is entitled hereunder shall be paid in lump sum unless such employee has elected, in a manner and form specified by the Shadow

Stock Committee, prior to the applicable Surrender Date to receive the amount of such benefits in ten (10) equal annual installments with the first installment to be paid on the date specified in paragraph "1" above and with each succeeding installment, together with interest (at a rate as determined below) on the unpaid balance from the first installment date, to be paid on or before the last business day in January of each succeeding year until the total unpaid balance plus interest is paid in full. For purposes of the above, interest shall be at a rate equal to eighty percent (80%) of the average daily prime rate quoted by Morgan Guaranty Trust Company for the year preceding the date of the interest payment.

## ARTICLE VIII

### Amendment of Plan

This plan may be amended at any time or from time to time by the Board of Directors of the Company, but no such amendment shall substantially impair the value of any shares of Shadow Stock then held by any employee without the written consent of such employee.

## ARTICLE IX

### Reissue of Existing Units

Every employee holding an existing contract(s) awarding Units all as described in the first preamble of this instrument shall be given the opportunity to surrender his contract(s) and the Units represented thereby and, in exchange therefor, to receive Certificates representing shares of Shadow Stock in a like amount and bearing an Issue Date coinciding with the date of such existing contract(s), all to the end that the shares of Shadow Stock shall have the same value and be Vested to the same extent as the Units and contract(s) so surrendered. Upon such surrender and substitution, the rights of the employee shall be governed by this plan and the Certificate(s) of shares of Shadow Stock so issued.

## ARTICLE X

### Miscellaneous

1. Neither the employee nor any Beneficiary shall have the right to sell, assign, or transfer any of the rights hereunder or evidenced by the Certificates issued hereunder; *provided, however,* that an employee may borrow funds from a bank or other similar financial institution and pledge as collateral the Certificate or Certificates issued to such employee hereunder, but only if the Shadow Stock Committee approves in advance of such pledge in writing, which approval shall be given if such Committee is satisfied (by execution of separate agreements or otherwise) that a default giving rise to a foreclosure of the pledge will only result in the initiation of a voluntary surrender of the Vested portion of the shares

of Shadow Stock, all as more fully described in paragraph "2" of ARTICLE V hereof.

2. Whenever under this plan any payments are to be made in cash, such payments may be net of any amount sufficient to satisfy federal, state and local withholding tax requirements as well as any amounts otherwise owed by the recipient to the Company or any of its subsidiaries.

3. No employee or Beneficiary shall have any rights, privileges or obligations with respect to any shares of Shadow Stock issued hereunder except as such rights, privileges or obligations are set forth in this plan or in any Certificate issued hereunder.

4. This plan shall be construed in accordance with and governed by the laws of the state of Kansas. In case any one or more of the provisions contained herein are, for any reason, held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this plan, but this plan shall be construed as if such invalid, illegal or unenforceable provision had never been contained here.

---

## APPENDIX II

## INSTRUCTIONS TO BENEFICIARY AND SETTLEMENT DESIGNATION

## UNDER

## KOCH INDUSTRIES, INC. SHADOW STOCK PLAN

TO: All holders of shares of Shadow Stock
FROM: The Shadow Stock Committee

ARTICLE IV of the Koch Industries Shadow Stock Plan (the "Plan") provides that each holder of shares of Shadow Stock issued under the Plan shall be requested to execute a beneficiary designation on the form to be prescribed by the Shadow Stock Committee. Paragraph 4 of ARTICLE VI of the Plan provides that all sums due and owing under the Plan will be paid in lump sum unless the holder of the shares of Shadow Stock has elected to have such payments made in annual installments over ten years at an interest rate as specified in the Plan.

Enclosed herewith is a Beneficiary and Settlement Designation form which has been approved and prescribed by the Shadow Stock Committee for the above purposes. Please fill in the appropriate blanks and deliver the same to a member of the Shadow Stock Committee. *If you do not complete, execute and deliver the attached form as above described, it will not be effective and all payments due on your death will be paid in lump sum to the legal representative of your probate estate.*

Except as set forth in the next paragraph, the Beneficiary and Settlement Designation can be changed at any time and from time to time by the completion and execution of another Beneficiary and Settlement Designation form and delivering the same to a member of the Shadow Stock Committee. *No change in beneficiaries or settlement mode will be effective unless the form is completed and filed as above stated.*

In order to avoid constructive receipt for income tax purposes, the Shadow Stock Committee has exercised its power to apply, administer and interpret the Plan by determining that a change in the settlement mode election for payments to the holder of the shares of Shadow Stock may not be effective until the year following the year of the change. In other words, if you initially elected a lump sum payment for yourself, a change to the 10 year installment method will not be effective until the year following the year in which the change is elected. The same is true if you initially selected a 10 year installment method and desired to change to a lump sum. Any changes in settlement modes with respect to beneficiaries, however, are effective immediately upon the execution and filing of the appropriate form.