T.C. Memo. 2009-203

UNITED STATES TAX COURT

FOXWORTHY, INC., ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 20725-03,   160-04,   Filed September 9, 2009.
            18969-04,   601-05,
            14612-05, 21699-05,
            24533-06.


<u>William E. Frantz</u> and <u>Donald B. DeLoach</u>, for petitioners Ron

H. Bell and Tricia S. Bell.

    <u>Robert H. Hishon</u>, for petitioner Foxworthy, Inc.

    <u>Stephen R. Takeuchi</u>, <u>Brianna B. Taylor</u>, <u>Joel D. McMahan</u>,

<u>Laura Beth Salant</u>, <u>Travis T. Vance</u>, and <u>Robert W. Dillard</u>, for

respondent.

---

[1]Cases of the following petitioners have been consolidated herewith for trial, briefing and opinion:  Foxworthy, Inc., docket Nos. 18969-04 and 14612-05, Ron H. Bell and Tricia S. Bell, docket Nos. 160-04, 601-05, 21699-05, and 24533-06.  All are hereinafter collectively referred to as the instant case.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, Judge:  Respondent determined deficiencies and penalties with respect to petitioners' Federal income tax as follows:

Foxworthy, Inc. (Docket No. 20725-03)

| Year | Deficiency | Penalty Under I.R.C. Sec. 6662(a) |
|------|-----------|-----------------------------------|
| 1999 | $2,508,226 | $501,645.20 |

Foxworthy, Inc. (Docket No. 18969-04)

| Year | Deficiency | Penalty Under I.R.C. Sec. 6662(a) |
|------|-----------|-----------------------------------|
| 2000 | $3,086,277 | $617,255.40 |

Foxworthy, Inc. (Docket No. 14612-05)

| Year | Deficiency | Penalty Under I.R.C. Sec. 6663(a) |
|------|-----------|-----------------------------------|
| 2001 | $653,801 | $490,350.75 |

Ron H. Bell and Tricia S. Bell (Docket No. 160-04)

| Year | Deficiency | Penalties Under I.R.C. Sec. 6663(a) | Sec. 6662(a) |
|------|-----------|-------------------------------------|--------------|
| 1999 | $4,520,032 | $3,390,024 | $904,006.40 |

Ron H. Bell and Tricia S. Bell (Docket No. 601-05)

| Year | Deficiency | Penalties Under I.R.C. Sec. 6663(a) | Sec. 6662(a) |
|------|-----------|-------------------------------------|--------------|
| 2000 | $4,489,883 | $3,367,412.25 | $897,976.60 |

Ron H. Bell and Tricia S. Bell (Docket No. 21699-05)

| Year | Deficiency | Penalties Under I.R.C. Sec. 6663(a) | Sec. 6662(a) |
|------|-----------|-------------------------------------|--------------|
| 2001 | $1,108,334 | $831,250.50 | $221,666.80 |

Ron H. Bell and Tricia S. Bell (Docket No. 24533-06)

| Year | Deficiency | Penalties Under I.R.C. Sec. 6662(a) | Penalties Under I.R.C. Sec. 6663(a) | Addition to Tax Under I.R.C. Sec. 6651(a)(1) |
|------|-----------|------|------|------|
| 1996 | $548,028 | $109,605.60 | $411,021 | $130,756.50 |
| 1997 | 1,747,365 | 349,473.00 | 1,310,445 | --- |
| 1998 | 1,180,512 | 236,102.40 | 885,384 | --- |

After concessions by the parties and settlement of several issues, the issues remaining for decision are: (1) Whether petitioners Ron H. Bell and Tricia S. Bell[2] are liable for the section 6663[3] fraud penalty for the years in issue; (2) whether, on account of fraud, the period of limitations remains open for the years in issue; (3) whether certain "offshore employee leasing transactions" (OEL transactions) that petitioner Ron H. Bell entered into during the years in issue lacked economic substance; (4) whether petitioner Ron H. Bell constructively received the money transferred as part of the OEL transactions; (5) whether petitioner Foxworthy, Inc. (Foxworthy), was Ron H. Bell's alter ego; (6) whether Foxworthy is entitled to deductions claimed regarding certain real property on Northside Drive, in Atlanta, Georgia; (7) whether petitioners Ron H. Bell and Tricia

---

[2]Tricia S. Bell is also referred to herein as Patricia D. Small (her maiden name).

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code), and all Rule references are to the Tax Court Rules of Practice and Procedure.

S. Bell are entitled to certain deductions claimed for expenses related to Bell Capital Management, Inc., an S corporation owned by petitioner Ron H. Bell; (8) whether petitioners Ron H. Bell and Tricia S. Bell are entitled to a certain nonbusiness bad debt deduction; (9) whether petitioner Ron H. Bell must recognize gain on interest and dividends on certain investment accounts; (10) whether petitioner Ron H. Bell must recognize capital gains on the liquidation of certain stock; (11) whether Bell Capital Management, Inc., was entitled to an employee business expense deduction for certain fines paid to the Securities and Exchange Commission (SEC); (12) whether petitioners are liable for the section 6662(a) negligence penalty for the years in issue; (13) whether petitioners Ron H. Bell and Tricia S. Bell are liable for the section 6651(a)(1) addition to tax for the years in issue; and (14) whether petitioners have shown sufficient grounds to supplement the record.

FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated by the parties. The parties' stipulations are incorporated in this opinion and are so found. The parties have stipulated that the venue for appeal of the instant case is the U.S. Court of Appeals for the Eleventh Circuit.

Petitioner Ron H. Bell (Mr. Bell) graduated from Vanderbilt University in 1968 and received a degree in electrical

engineering.  During 1970 Mr. Bell graduated from Emory University and received a master's of business administration. During the years in issue Mr. Bell was a chartered financial analyst of the CFA Institute as well as a chartered investment counselor of the Investment Counselor Association of America.

After graduating from Emory, Mr. Bell worked for Asset Management in Atlanta, Georgia, for 1 year specializing in investment research.  Subsequently, Mr. Bell worked for National Service Industries, Inc., for 12 years in various positions.  At National Service Industries, Mr. Bell developed a risk control process of managing investments.  The objective of the risk control process was to protect investments from participating in periods of significant decline while allowing them to produce attractive returns.

During 1984 Mr. Bell incorporated Bell Capital Management, Inc. (BCM).  During May 1988 Mr. Bell elected to treat BCM as an S corporation.  From Mr. Bell's incorporation of BCM in 1984 and throughout the years in issue, Mr. Bell owned 100 percent of BCM and was its sole director.  At BCM Mr. Bell made the risk control process he developed at National Service Industries available to individual clients and their financial planners.

During 1991 through 2001 Mr. Bell's duties as BCM's employee included the supervision and direction of business operations, providing services to clients as a financial planner, investment

counselor, and wealth manager, and in related capacities.  From 1987 through 2001, investment decisions on behalf of BCM clients were made by BCM's investment committee.  The investment committee comprised Mr. Bell, Thomas C. Comsudes (Mr. Comsudes), and Mark S. Palmer (Mr. Palmer).  Mr. Comsudes and Mr. Palmer began contributing as decision makers after each had worked at BCM for several years.

During 1984 Mr. Comsudes graduated from Stetson University and received a bachelor's degree in business administration.  Mr. Comsudes worked for Fidelity Investments for approximately 6 months after graduating from Stetson University.  During June 1985 Mr. Comsudes met Mr. Bell and began working at BCM.  When Mr. Comsudes started working for BCM, he handled administrative functions and placed buy and sell orders.  As the years went by, Mr. Comsudes assumed more responsibility and handled some of the investment research.

During 1984 Mr. Palmer graduated from the University of Georgia and received a BBA degree in finance.  During 1987 Mr. Palmer received a master's in business administration from Georgia State University.  Mr. Palmer is also a chartered financial analyst and a CFA Institute member.  Mr. Palmer, like Mr. Comsudes, handled administrative duties when he joined BCM and later worked his way up to investment research.

During 1996 BCM moved to new offices in Atlanta to accommodate the growth it experienced. At the time of the move,

BCM had five employees. Shortly after the move, BCM hired three additional workers. By 2003 BCM had 20 employees.

By the end of 1995 BCM managed the portfolios of 1,100 clients with an aggregate market value of $280 million. By the end of 1999 business had improved and BCM managed the portfolios of 2,283 clients with an aggregate market value of $531,531,263. BCM received quarterly fees as compensation for investment services. Clients paid the fees either by writing checks each quarter or by having the fees deducted from their accounts.

From 1991 through 1995 BCM paid Mr. Bell wages of $761,978, $978,772, $691,006, $589,760, and $630,760, respectively. During 1996 through 2001, the taxable years in issue, Mr. Bell reported on his Federal income tax returns wages of $75,000, $75,000, $75,000, $75,000, $75,000, and $37,500, respectively. For 1996 through 2000 Mr. Bell reported on his Federal income tax returns wages received from Nationwide Executive Staff Leasing (NESL), and for 2001 Mr. Bell reported on his Federal income tax return wages received from International Leasing Services (ILS).

Petitioner Tricia S. Bell (Mrs. Bell) received a degree from Kings Business School. For over 10 years Mrs. Bell worked as a paralegal for a law firm in North Carolina. During 1972 Mrs.

Bell moved to Atlanta. Mrs. Bell worked as a paralegal for an Atlanta law firm for over 10 years.

During either 1979 or 1980 Mrs. Bell became interested in interior plant design as a hobby. During the early 1980s Mrs. Bell stopped working as a paralegal and opened her own interior plant design business under the name "Plantlease". Plantlease bought, sold, and maintained interior plants for offices and office buildings.

After Plantlease's business declined, Mrs. Bell, sometime around 2000, sold Plantlease. Thereafter Mrs. Bell became a 50-percent owner of Kaleidoscope, a lawn maintenance company. Belinda Cochran owned the other 50 percent of Kaleidoscope and was responsible for its day-to-day operations.

During the years in issue Mr. and Mrs. Bell (hereinafter, sometimes, the Bells) were cash method taxpayers.

Deductions Claimed by BCM and by the Bells

During the taxable years in issue BCM claimed deductions related to its business and reported the deductions on its Forms 1120S, U.S. Income Tax Return for an S Corporation. The net income of BCM was then reported on the Bells' Schedule E, Supplemental Income and Loss, for the respective years.

For the following taxable years BCM deducted the following amounts paid for the services of Mr. Bell: $800,000 for 1996, $1,220,000 for 1997, $2,225,000 for 1998, $2,430,000 for 1999,

$1,880,000 for 2000, and $425,000 for 2001. Respondent disallowed all those amounts.[4]

In addition to the money BCM paid Mr. Bell, it claimed several other expenses. Respondent determined that BCM overstated its deductions by $1,228,088, $1,702,817, $2,678,033, $3,195,463, $1,966,457, and $651,470 for 1996, 1997, 1998, 1999, 2000, and 2001, respectively. For 1999 and 2000 BCM claimed $3,740 and $1,400, respectively, for contract labor performed by Sharon Mamrose Womble, an artist. Mrs. Bell hired Ms. Womble to paint the outside and inside of the wine cellar of the Bells' residence at 4371 Northside Drive (Northside). Mr. Bell approved the expense as a business expense for BCM.

From taxable years 1996 through 1999, BCM claimed deductions of $400,000, $400,000, $250,000, and $250,000, respectively, on its Forms 1120S as expenses paid to Mycroft, Ltd. (Mycroft), an alleged Irish corporation owned by John Fitzgerald. The payments to Mycroft were allegedly for advertising and marketing BCM to potential European clients, business development, seminar expenses, travel, professional fees, and printing.

In addition to the professional fees deducted as part of the OEL transactions, see infra pp. 14-22, BCM claimed deductions of $57,129.52, $441,992.36, $288,302.81, $254,856, $5,212, and

---

[4]These amounts represented payments as part of the OEL transactions described below.

$46,881 for professional fees on its Federal income tax returns for taxable years 1996 through 2001, respectively. Respondent disallowed all of the deductions. On its returns, BCM claimed deductions of $56,178, $12,346, and $20,500 for business development for taxable years 1996 through 1998, respectively. Respondent disallowed the entire amount of each deduction. BCM also claimed deductions of $33,458, $69,205, $140,709, $33,639, and $107,774 for travel and lodging for taxable years 1996, 1998, 1999, 2000, and 2001, respectively. Respondent disallowed all of those deductions. BCM claimed a deduction of $49,258 for advertising expenses paid to Mycroft for taxable year 1996. BCM claimed deductions of $5,000, $26,042, $11,203, $4,388, $3,297, and $13,921 for legal fees paid to Reiserer & Agee, LLP, for taxable years 1996 through 2001, respectively. BCM claimed deductions of $87,624, $55,200, $82,046, and $17,650 for marketing for taxable years 1996, 1998, 1999, and 2000, respectively. BCM claimed a deduction of $30,505, $9,632, $33,626, and $2,685 for office supplies for taxable years 1996, 1999, 2000, and 2001, respectively. BCM claimed a deduction of $105,762 paid to Mycroft for taxable year 1996 and a deduction of $7,318 for taxable year 1998 paid to various organizations for seminars. BCM claimed deductions of $3,174, $2,437, $1,305, $1,000, and $1,881 for utilities for taxable years 1996, 1997, 1998, 2000, and 2001, respectively. BCM claimed deductions of

$83,249.91 and $16,745.42 for employee business expenses for taxable years 1999 and 2000, respectively. BCM claimed deductions of $24,640, $49,280, and $36,960 for rent paid to Foxworthy for taxable years 1999 through 2001, respectively. BCM claimed deductions of $12,401.10, $1,802.18, and $3,046.04 for meals and entertainment for taxable years 1999 through 2001, respectively. BCM claimed a deduction of $153,541 for contract labor for taxable year 1999. BCM claimed deductions of $1,692, and $1,997 for taxes and licenses paid to Cherokee County and Dekalb County for taxable years 2000 and 2001, respectively. BCM claimed deductions of $1,200 and $4,500 paid to Georgia State University for continuing education of Kelli Bell[5] for taxable years 2000 and 2001, respectively. BCM claimed deductions of $2,317 and $2,078.20 for insurance for taxable years 2000 and 2001, respectively. BCM claimed a deduction of $15,540 for a new telephone system[6] for taxable year 2001. BCM claimed a deduction of $1,774.70 for dues and subscriptions for taxable year 2001. BCM claimed a deduction of $3,785.52 for repairs and maintenance for taxable year 2001. Respondent disallowed all of BCM's claimed deductions listed above.

---

[5]Kelli Bell is the daughter of petitioners Ron H. Bell and Tricia S. Bell.

[6]Respondent determined that the deduction for the new telephone system should have been capitalized, not deducted.

On September 30, 1998, the SEC fined BCM, Mr. Bell, Mr. Comsudes, and Mr. Palmer because they were in violation of section 203(e), (f), and (k) of the Investment Advisers Act of 1940. BCM was fined $15,000, and the three individuals were each fined $10,000. BCM paid the entire $45,000 in 1999 because it considered itself the beneficiary of the work of Mr. Bell, Mr. Comsudes, and Mr. Palmer. BCM deducted the entire $45,000 as an employee business expense for taxable year 1999. Respondent disallowed the entire $45,000 deduction.

Mr. and Mrs. Bell claimed charitable contribution deductions of $161,604, $192,377, $87,572, $139,653, and $69,386, respectively, for taxable years 1996, 1997, 1998, 1999, and 2000. Respondent disallowed those deductions in the following amounts: $155,001 for 1996, $171,103 for 1997, $77,253 for 1998, $139,653 for 1999, and $62,915 for 2000. The disallowed deductions are contributions to the Bell Family Foundation for Hope, Inc. (foundation), an entity organized under section 501(c)(3). During 1996 the Bells contributed to the foundation 27,000 shares of Northeast Investors Trust, a mutual fund, owned by the Bells through their partnership R&P Partnership. At the time of the contribution the shares were worth $11.12 each, a total of $300,240. During 1996 the Bells also contributed $2,250 to Youth Cultural, $115 to Braves Foundation, and $1,000 to the Gorham-McBane Library. In addition, the Bells claimed a charitable

contribution deduction of $3,238 as 50 percent of the contributions from Mr. Bell's Schedule K-1, Shareholder's Share of Income, Credits, Deductions, etc. During 1997 the Bells contributed to the foundation another 18,000 shares of Northeast Investors Trust, again owned by the Bells through the R&P Partnership. At the time of the contribution, the shares were worth $11.24 each, a total of $202,320. During 1997 the Bells also contributed $334 to Georgia State University, $15 to Georgia Tech, $251 to Auburn University, $8,700 to the Unity North Church, and $470 to Goodwill. In addition, the Bells claimed a charitable contribution deduction of $12,444 as 50 percent of the contributions from Mr. Bell's Schedule K-1. Of the $87,572 claimed by the Bells as a charitable contribution deduction for 1998, $77,253 was a carryover from the previous year. Of the $139,653 claimed by the Bells as a charitable contribution deduction for 1999, $119,934 was a carryover. Of the $69,386 the Bells claimed as a charitable contribution deduction for 2000, $62,915 was a carryover.[7] Respondent disallowed the charitable contribution deductions to the foundation because Mr. Bell controls the foundation and because respondent disputes that the shares were transferred.

---

[7]In addition to the carryover amounts claimed in 1998, 1999, and 2000, the Bells claimed charitable contributions of $10,319 in 1998, $19,719 in 1999, and $6,471 in 2000.

Offshore Employee Leasing Transaction

During 1996 Mr. Bell's client Larry Calhoon (Mr. Calhoon) asked Mr. Bell whether he was interested in learning about an employee leasing deferred compensation plan. Mr. Bell indicated that he was. Mr. Calhoon sent Mr. Bell employee leasing information written on Kenneth Reiserer's (Mr. Reiserer) letterhead. Mr. Calhoon received a fee from Mr. Reiserer for referring Mr. Bell to him.

Mr. Bell contacted Mr. Reiserer about employee leasing on several occasions. Additionally, beginning in 1997 Mr. Bell attended seminars that featured Mr. Reiserer as a speaker. Mr. Reiserer sent Mr. Bell a 14-page document explaining "The Foreign Deferred Compensation Program". After discussion with Mr. Reiserer, Mr. Bell decided to participate in the OEL transactions set up by Mr. Reiserer. The OEL transactions were to start on December 1, 1996, and were to be carried out in accordance with an undated "Contract For Personnel Services" (contract), signed by Mr. Reiserer as president of NESL and Mr. Comsudes as vice president of BCM. On November 5, 1997, Mr. Reiserer forwarded the contract to Mr. Bell to be finalized. The contract was returned to Mr. Bell on December 4, 1997.

As part of the OEL transactions, on December 19, 1996, BCM wired $800,000 to NESL, a domestic leasing company owned and operated by Mr. Reiserer. During 2001 Mr. Reiserer changed the

name of NESL to ILS.[8]  On its Form 1120S for its 1996 taxable year, BCM listed the $800,000 wired to NESL as a deduction for professional fees.  Mr. Bell did not report any wages from BCM for taxable year 1996.  Mr. Bell alleges that during December 1996 he was an employee of NESL and received wages of $75,000.

On December 23, 1996, after deducting from the $800,000 a management fee of $24,000 and a consulting fee to Mr. Calhoon of $8,000, NESL wired $767,950 to Montrain Services, Ltd. (Montrain).  Montrain is an Irish corporation that allegedly was Mr. Bell's employer and leased Mr. Bell's services to NESL, which in turn leased Mr. Bell's services to BCM.  In the "Foreign Deferred Compensation Program"[9] document given to Mr. Bell, Mr. Reiserer wrote that "to avoid United States taxation, the Irish corporation [Montrain] cannot be deemed to be engaged in business in the United States."  That same day, Montrain wired back to NESL $77,480 to cover expenses of paying an alleged salary of $75,000 to Mr. Bell along with other related expenses. Additionally, Montrain returned to NESL $3,300, and $645,905.67 was deposited in an account under the name "Ruritania".  On March

_____

[8]Mr. Bell was not able to produce a copy of a personnel services contract between BCM and ILS.

[9]The "Foreign Deferred Compensation Program" document was written by Mr. Reiserer to Mr. Bell.  The document explains the foreign deferred compensation planning program, and contains Mr. Reiserer's legal analysis of the program and how the program of OEL transactions would work for Mr. Bell.

7, 1997, the balance of $652,000 in the Ruritania account was invested with Davis, Weaver & Mendel.[10]  Thomas Weaver[11] managed the $652,000 in an account with Rydex Investments.

During December 1997 BCM made three wire transfers to NESL totaling $1,220,000, one on December 2 for $1 million and two on December 16 for $35,000 and $185,000, respectively.  On its Form 1120S for its 1997 taxable year BCM listed the transfers as professional fees.  As of December 8, 1997, $899,980,000 of the $1 million transferred to NESL was deposited in a Charles Schwab (Schwab) account for RHB Corp.[12]  By December 24, 1997, another $122,980 was deposited into the RHB Corp. Schwab account.  The balance of the money transferred was paid to NESL and Montrain for fees.

In a letter dated July 17, 1997, Mr. Bell expressed his displeasure over the cost of doing business with Montrain.  Mr. Bell believed that he could replicate the services of Montrain at a lower cost.

Mr. Bell was unhappy with the 7-day delay in having money transferred to the RHB Corp. Schwab account.  Mr. Bell indicated

---

[10]Davis, Weaver & Mendel was an investment management firm based in Atlanta.

[11]Thomas Weaver, a friend of Mr. Bell, was the majority owner and president of Davis, Weaver & Mendel.

[12]RHB Corp. is a Nevis-based corporation Mr. Bell incorporated.  RHB Corp.'s original name was Rossendale Investments.  Nevis is an island in the Caribbean Sea.

that he was losing money because interest was not accruing to his benefit during the delay. Mr. Bell expressed his unhappiness to James Jantos (Mr. Jantos), an associate at Mr. Reiserer's law firm. Consequently, Mr. Jantos contacted Judy Lovell[13] (Ms. Lovell) and requested an accounting of the money transferred to the RHB Corp. account.

On October 7, 1997, Mr. Comsudes opened a corporate stock brokerage account in Foxworthy's name at Schwab. Mr. Bell brought Mr. Comsudes the documents to sign in order to open the Foxworthy Schwab account. On October 9, 1997, Mr. Comsudes opened a bank account at SunTrust Bank in Foxworthy's name. During either May or June 1999, Mr. Comsudes opened a second corporate stock brokerage account with Schwab in Foxworthy's name. Mr. Bell brought Mr. Comsudes the documents to sign to open the second Foxworthy Schwab account.

Mr. Bell had three Nevis companies incorporated: Ballyclare Holding, Inc. (Ballyclare), Helston Services, Inc. (Helston), and Rossendale Investments (Rossendale). Mr. Bell later requested that Rossendale change its name to RHB Corp.. The Elfin Trust (Elfin), chosen by Mr. Bell, administered Ballyclare. Mr. Bell's contacts at Elfin were Ms. Lovell, Robert Kerriege, and John

---

[13]Judy Lovell was one of Mr. Bell's contacts at the Elfin Trust, which was chosen by Mr. Bell to administer Ballyclare Holding, Inc., a Nevis corporation used by Mr. Bell as part of the OEL transactions.

Robbiliard.  One of the reasons Ballyclare needed a third-party administrator is that Ballyclare had no employees.

During May 1998 Mr. Bell's contacts at Elfin were concerned that there was an unwanted link between Mr. Bell and RHB Corp. Consequently, Mr. Bell asked that Mr. Weaver manage the funds in the RHB Corp. Schwab account through Tahosa Valley Investments.

Mr. Bell recommended that Ballyclare, Helston, and Rossendale each set up accounts with Charles Schwab.  A fourth account in Mr. Reiserer's name was also set up with Schwab.  The four accounts were opened at the Cobb County, Georgia, Schwab branch, the office closest to BCM's headquarters.  Mr. Bell provided limited power of attorney forms for the Schwab accounts. The forms were signed using a signature stamp of William Zarrett[14] (Mr. Zarrett).  Mr. Bell did not have permission to use Mr. Zarrett's signature stamp on the limited power of attorney forms, and Mr. Zarrett never conducted business on behalf of Ballyclare, Helston, or Rossendale or its later name RHB Corp. Mr. Reiserer directed Ms. Lovell to have Elfin acquire 100 percent of the voting common stock of the three Nevis corporations.  Furthermore, Mr. Reiserer indicated to Ms. Lovell that each Nevis corporation needed minutes created and that

_____

[14]Mr. Zarrett is Mr. Bell's personal friend.  The two met in 1968 at Emory University.  Mr. Zarrett was the trustee of the Mycroft Trust, set up for Kelli Bell.  Mr. Zarrett also had limited power of attorney over Ballyclare and Helston.  At the time of trial, Mr. Zarrett was a retired banker.

statements from the Schwab accounts were to be confidentially provided to Mr. Bell.

The investment income on the Helston, Ballyclare, and Rossendale/RHB Corp. Schwab accounts is as follows:

| Account | 1997 | 1998 | 1999 | 2000 | 2001 |
|---|---|---|---|---|---|
| Helston | $8,445.10 | --- | --- | --- | --- |
| Ballyclare | 7,469.19 | --- | --- | --- | --- |
| Rossendale/RHB | 37,031.00 | $168,287.61 | $126,963.85 | $96,235.40 | $141,916.42 |

Of the $126,963.85 of income in the Rossendale/RHB Corp. Schwab account during 1999, $18,166.50 consisted of dividend income; the rest of the income from all the accounts is interest income. Mr. Bell did not report any of the income from the Helston, Ballyclare, and Rossendale/RHB Corp. Schwab accounts on his tax returns for the respective taxable years.

On June 3, 1998, BCM wired $250,000 to NESL. On July 20, 1998, BCM wired $500,000 to NESL. Additionally, on that day, Mr. Bell sent a note to Mr. Reiserer requesting that the $500,000 BCM wired to NESL be transferred quickly to RHB Corp.'s Schwab account because of the potential for lost interest in the event of a delay in the transfer. On October 26, 1998, BCM wired an additional $500,000 to NESL. BCM wired $800,000 to NESL on December 17, 1998, and $175,000 on December 24, 1998. As in previous years, BCM claimed a deduction for the transfers on its Form 1120S for taxable year 1998 as "professional fees". By January 6, 1999, the money BCM transferred to NESL was deposited

in RHB Corp.'s Schwab account, less fees to Montrain.  During 1998 $550,000 was transferred from the RHB Corp. Schwab account as a loan to Mr. Bell's church, the Unity Church.  Mr. Bell requested that Ms. Lovell provide Internet access to the account and give him the password to the account in order to keep track of the RHB Corp. Schwab account.

On September 20, 1999, BCM wired $1,200,000 to NESL.  On December 20, 1999, BCM wired $1,230,000 to NESL.  As in previous years, BCM claimed a deduction for the transfers on its Form 1120S for taxable year 1999 as "professional fees".  By January 5, 2000, the transferred money, less the fees of NESL and Montrain, was wired from the Royal Bank of Scotland to Foxworthy's SunTrust Bank account.  Mr. Bell was unsatisfied with the fees charged to implement the OEL transactions.  Mr. Reiserer wrote a note to Mr. Bell highlighting the significant tax savings of the OEL transactions and told Mr. Bell he was trying too hard for "perfection".

On August 29, 2000, BCM wired $800,000 to NESL.  On December 21, 2000, BCM wired $1,080,000 to NESL.  As in previous years, BCM claimed a deduction for the wire transfers on its Form 1120S for taxable year 2000 as "professional fees".  On August 31, 2000, the $800,000, less fees, a net of $767,900, was wired offshore.  On December 21, 2000, the $1,080,000 less fees, for a net of $955,700, was wired offshore.

On March 22, 2001, BCM wired $375,000 to NESL. On December 18, 2001, BCM wired $50,000 to ISL.[15] BCM claimed a deduction on its Form 1120S for taxable year 2001 for the wire transfers as "professional fees". On March 23, 2001, NESL wired $319,300 offshore to Fitzwilliam International Resource Services Limited (Fitzwilliam).[16] On June 22, 2001, Fitzwilliam transferred $260,000 of the $319,300 to an account in the name of Mr. Bell's trust. Fitzwilliam set up the trust for Mr. Bell with Elfin as the trustee. Mr. Bell wanted to know why only $260,000 had been transferred to the trust. Mr. Reiserer informed Mr. Bell that Mr. Bell had not accounted for the $37,500 wages to Mr. Bell. On December 28, 2001, ISL wired $47,800 offshore. On December 31, 2001, $44,000 of the $47,800 was transferred to Mr. Bell's trust account.

During the years in issue Mr. Bell's duties at BCM did not change. Also during the years in issue, BCM provided Mr. and Mrs. Bell with health insurance. Additionally, BCM, not NESL, ISL, Montrain, Pixley, or Fitzwilliam paid Mr. Bell's employee expenses. Furthermore, during the years in issue BCM filed with the SEC forms listing Mr. Bell as president and as its contact

[15]Sometime before this transfer, NESL changed its name to ISL.

[16]In 1999 Pixley Services (Pixley) took the place of Montrain as Mr. Bell's alleged offshore employer. In 2001 Fitzwilliam took the place of Pixley as Mr. Bell's alleged offshore employer.

person.  During the years in issue, Mr. Bell did not receive guidance from NESL, ISL, Montrain, Pixley, or Fitzwilliam but performed his duties as he himself determined.

Foxworthy

Mr. Reiserer incorporated Foxworthy on August 12, 1996, in Nevada.  Foxworthy's initial officers were Mr. Reiserer as president and Sonia M. Agee (Ms. Agee) as secretary and treasurer.  Mr. Reiserer was an attorney in Bellevue, Washington.[17]  Ms. Agee was an associate at Mr. Reiserer's law firm.  As of August 13, 1997, Foxworthy had no assets.  Mr. Bell suggested that Foxworthy use a Reno, Nevada, address he previously had obtained as a result of identity theft he had experienced.  The Reno address is a mail forwarding service, with mail forwarded to BCM in Atlanta, Georgia.  Petitioners allege that Foxworthy is owned by Ruritania, Ltd. (Ruritania).  Petitioners further allege that Ruritania is a corporation formed under the laws of Jersey, Channel Islands.  On March 18, 1998, Foxworthy issued Ruritania a stock certificate for 2,500 shares.  Mr. Bell requested that Mr. Comsudes, as president of Foxworthy, sign the certificate.

Northside

During 1997 Mrs. Bell inquired about a house at 4371 Northside Drive, Atlanta, Georgia (Northside).  Mrs. Bell toured

---

[17]Mr. Reiserer died during July 2004.

Northside on multiple occasions during 1997 when Sam Foreman owned Northside. Mr. Bell spoke to Jill Elliott regarding the purchase of Northside. On or about October 15, 1997, Northside was purchased from Mr. Foreman in the name of Foxworthy. Mr. and Mrs. Bell, not Foxworthy, selected Northside. After purchasing Northside, Mr. and Mrs. Bell asked Larry Graham (Mr. Graham) to work at Northside to manage and care for the property. Mrs. Bell worked with an interior designer to select furnishings for Northside. During 1997, shortly after it was purchased, Mr. and Mrs. Bell moved into Northside. Although an alleged lease agreement between Foxworthy and Mr. and Mrs. Bell was not signed until November 1, 2001, the Bells used Northside as their primary residence during the workweek from the time they moved into the residence during 1997.

Before Foxworthy closed on Northside, Mr. Reiserer suggested that someone in Atlanta should be the president of Foxworthy. Mr. Bell asked Mr. Comsudes to be the president, and, on September 30, 1997, Mr. Comsudes became president of Foxworthy. Mr. Comsudes never met Mr. Reiserer and did not know who Foxworthy's shareholders were. Furthermore, Mr. Comsudes had no day-to-day activities as president of Foxworthy. Mr. Comsudes, in his words, "looked to" Mr. Bell and Mr. Reiserer in his dealings with Foxworthy.

Foxworthy purchased Northside using a $2,110,000 wire transfer that took place on October 14, 1997. The money was transferred from Schwab accounts in the name of Helston and Ballyclare. Helston and Ballyclare obtained the funds from a Schwab account in the name of Mr. Reiserer. The Reiserer Schwab account obtained the funds from an August 19, 1997, liquidation of stock.[18] The Reiserer account received the stock on August 15, 1997 from a transfer from four Schwab accounts in the names of (1) R&P Partnership, Ron H. Bell TTEE, (2) Hoyt Bell Revocable Trust, Ron H. Bell TTEE, (3) Roberta L. Bell Revocable Trust, and (4) Kelli Bell. R&P Partnership is owned by Mr. and Mrs. Bell. The proceeds from the liquidation of stock transferred from R&P Partnership Schwab account were transferred to Rossendale's (later known as RHB Corp.) Schwab account. The proceeds of the liquidation of stock transferred to the Rossendale Schwab account totaled $2,225,181.96. The gain on the liquidation of stock in the Reiserer account during 1997 was $329,363.38. Mr. Bell authorized all the transfers of stock. The $2,225,181.96 transferred to the Rossendale Schwab account was part of an asset

---

[18]Mr. Reiserer expected that the Reiserer Schwab account would have income from the liquidation of stock. Mr. Reiserer contacted Mr. Bell about two ways to report the income. Mr. Bell instructed Mr. Reiserer that he preferred Mr. Reiserer to report the income and to pay the tax from the residual amount in the Reiserer Schwab account.

exchange to RHB Corp. in return for an alleged private annuity for the benefit of Mr. Bell.

The transfers through which Foxworthy acquired funds for its purchase of Northside were structured as loans from Ballyclare and Helston to Foxworthy. Mr. Bell later suggested changing the structure of the purported loans. Mr. Bell's plan was to have Ballyclare lend money to Helston, which then lent money to Foxworthy. Mr. Bell and Mr. Reiserer collaborated on the preparation of the mortgages and notes used to buy Northside.

Mr. and Mrs. Bell procured homeowners insurance on Northside in Mrs. Bell's maiden name, Patricia D. Small. The homeowners policy listed Foxworthy as an additional insured. The Bells explained to the insurance company that Foxworthy was added as an additional insured because Foxworthy was their company for tax purposes and it owned the house. Had Foxworthy been the only insured on the Northside policy, the policy would have been more expensive. Additionally, Northside was insured for personal use, not business use.

On September 8, 1998, Foxworthy filed a Form 1120, U.S. Corporation Income Tax Return, for its 1997 taxable year. Mr. Comsudes signed the Form 1120 at Mr. Bell's request. Before filing the tax return, on March 13, 1998, Foxworthy filed a Form 7004, Application for Automatic Extension of Time To File Corporation Income Tax Return. Larry Graham's name appears to be

signed on the signature line on the Form 7004.  However, Mr. Graham did not in fact sign the Form 7004.

On October 27, 1997, Foxworthy purported to enter into a lease with BCM for the third floor of Northside.  Mr. Bell purported to negotiate the terms of the lease on behalf of BCM, and Mr. Reiserer purported to negotiate the terms on behalf of Foxworthy.  Mr. Graham's name appears on the signature line as Foxworthy's representative; however, he did not sign the lease and was never an officer or authorized to sign on behalf of Foxworthy.

On April 1, 1998, Mr. Bell, on behalf of BCM, and Mr. Graham, on behalf of the Whitehall Inn, purportedly entered an agreement between BCM and the Whitehall Inn whereby the Whitehall Inn would provide accommodations at Northside to individuals doing business with BCM.  As in the case of other documents bearing his name, Mr. Graham did not sign this agreement and was not aware of it.  Mr. Comsudes was not familiar with the Whitehall Inn and was not familiar with an agreement between the Whitehall Inn and BCM.  The Whitehall Inn is an assumed name for Foxworthy.

From 1997 through 2001 BCM paid Foxworthy for allegedly renting Northside.  Additionally, the Whitehall Inn prepared invoices to BCM for guests who allegedly stayed at Northside.  However, no guests actually stayed at Northside.  Linda Sagaert

(Ms. Sagaert) prepared the invoices at the request of Mr. Bell. Mr. Bell also gave Ms. Sagaert the information needed to prepare the invoices.

From 1997 through 2001 Northside was legally zoned as a single-family residential property and therefore not permitted to be used as a hotel. When BCM entertained guests from out of town, the guests usually stayed at the Waverly Inn. No guests stayed at Northside.

Mr. and Mrs. Bell lived at Northside, allegedly as tenants of Foxworthy. At the beginning of 1997 Foxworthy had no assets. At the end of the year Foxworthy had $177,983 in cash, $3,036 in trade notes and receivables, $1,511,064 in buildings and other "depreciable" assets, and $600,000 in land. The buildings and other "depreciable" assets and land related to Northside.

During taxable year 1997 Foxworthy reported a net operating loss of $19,004. The net operating loss is the result of an excess of deductions for repair and maintenance, taxes and licenses, depreciation, and other items, over the income reported for rent, dividends, and interest. The income Foxworthy earned and the deductions it claimed for taxable year 1997 were related to Northside.

During taxable year 1998 Foxworthy reported a net operating loss of $82,304. The loss is the result of a $19,904 carryover

loss from 1997, increased by the excess of deductions for repair and maintenance, taxes and licenses, depreciation, and other items, over the income reported for rent, dividends, and interest.

For taxable year 1997 through taxable year 2001 Foxworthy claimed deductions for depreciation, insurance expenses, utility expenses, and lawn maintenance, all related to Northside. Additionally, for taxable year 1999 through taxable year 2001 Foxworthy claimed deductions for maid services performed at Northside. For taxable year 2000 through taxable year 2001 Foxworthy claimed deductions for janitorial and cleaning expenses relating to Northside. Foxworthy also claimed deductions for payments to Mr. Graham. Mr. Graham worked at Northside for the previous owners, and Mrs. Bell hired him to stay after the Bells moved into Northside. Foxworthy claimed the deductions for the payments to Mr. Graham as business expenses.

Northside suffered water damage. Consequently, during June 1999 the Bells submitted an insurance claim. On June 22, 1999, Chubb insurance issued a check from Great Northern Insurance Co. (Great Northern) to Patricia D. Small of $1,059.02 for the water damage. On July 16, 1999, Chubb issued a second check from Great Northern to Patricia D. Small of $18,061 to compensate for water damage to the floors and phone system at Northside. Mrs. Bell deposited the check for $18,061 into her personal bank account.

During January 2001 Mr. Bell became interested in purchasing a 1958 Rolls Royce. Mr. Bell visited the owner in Augusta, Georgia, and drove the car back to Atlanta. On January 21, 2001, Mr. Bell placed the title of the Rolls Royce in Foxworthy's name. The insurance application for the Rolls Royce lists Mr. Bell as the insured and Foxworthy as an additional insured. Mr. Bell and Mrs. Bell are listed as the two drivers.

Tax Deed Business

During the summer of 1998 Mr. Bell began reading about tax deeds. After consulting with Lynn Featherly and D.J. Adams, who both had experience in the tax deed business, Mr. Bell decided to invest in the tax deed business. Mr. Bell contracted with Ms. Featherly and Mr. Adams to perform research and develop a business plan to be used by BCM. Mr. Bell recommended that Foxworthy invest in the tax deed business because he felt it was lucrative.

Foxworthy needed capital in order to become engaged in the tax deed business. Mr. Bell arranged a series of loans to Foxworthy to fund the tax deed business. The loans came from Shirley Hearle, who was Mr. Bell's first cousin, Investment Partnership 00, which was a partnership in which Mr. Bell was the general partner, and four customers of Mr. Bell. Additionally, Foxworthy received loans from the foundation, Ms. Sageart, and Mr. Palmer. Furthermore, loans are alleged to have come from the

three Nevis corporations, RHB Corp., Ballyclare, and Helston.
Mr. Bell orchestrated all of the loans to Foxworthy.  Most of the
money for the tax deed business came from Mr. Bell's OEL
transactions, chiefly in the name of RHB Corp.  By December 31,
1999, Foxworthy had borrowed $4,729,990 from RHB Corp.  By
December 31, 2001, the amount of the loan had increased to
$8,839,965.

During 2000 Mr. Bell asked Charles L. Wilson III (Mr.
Wilson) to become president of Foxworthy, replacing Mr. Comsudes.
One of the reasons Mr. Bell replaced Mr. Comsudes was that he
wanted no connections between Foxworthy and the RHB Trust in
order that the loans from the RHB Corp. to Foxworthy would be
viewed as arm's-length transactions.  During 1999 Mr. Wilson
became an employee of BCM and continued to receive a salary from
BCM during 2000 and 2001.  Mr. Wilson does not have a college
degree, and before he worked for BCM, his work experience was as
a store designer and events coordinator.  At BCM Mr. Wilson
initially oversaw the computer system and was a special projects
manager earning an annual salary of approximately $30,000.
After becoming Foxworthy's president during 2000, Mr. Wilson
oversaw the tax deed business.  Mr. Wilson looked to Mr. Bell and
Mr. Reiserer in dealings on behalf of Foxworthy; and when he
started working for BCM, he reported to Mr. Bell.

During May 1999 Foxworthy opened a brokerage account at SunTrust Equitable Securities (SunTrust Equitable). Mr. Bell, Mr. Comsudes, and Mr. Reiserer were the three signatories on the account. Mr. Bell was listed as a consultant. Mark Kallis, an account representative at SunTrust Equitable who handled the Foxworthy account, took instructions only from Mr. Bell and never from Mr. Comsudes or Mr. Reiserer.

During December 1999 Mr. Bell thought that it might be wise to restructure the tax deed business using RHB Corp. as the primary entity as opposed to Foxworthy. In a note to Mr. Reiserer, Mr. Bell wrote that because Foxworthy was a domestic entity and subject to taxes, RHB Corp. might be better suited for the tax deed business because it was a foreign entity.

During the months that followed, Mr. Bell continued to seek avenues to limit Foxworthy's taxable income for taxable year 2000. During January 2000 Mr. Bell proposed to Mr. Reiserer to increase the interest Foxworthy paid on the loan from RHB Corp. Mr. Bell followed up during February. During February 2000 Mr. Bell wrote to Mr. Reiserer that Foxworthy could pay its debt in October 2000 but that it would want to re-borrow at a higher interest rate in order to shift more profits out of Foxworthy. Mr. Bell noted that doing so would be costly and that he wanted to keep the options open.

On March 15, 2000, Mr. Bell sought more funding for the tax deed business. In a note to Mr. Reiserer, Mr. Bell indicated that a bank was willing to extend a line of credit of $10 million to purchase tax deeds. The bank intended to fund 75 percent of the purchase of each deed. In the note to Mr. Reiserer, Mr. Bell wrote that he would have to fund the remaining 25 percent.

Bad Debt Deduction

Mr. Bell claimed as a flowthrough item from R&P Partnership a nonbusiness bad debt deduction of $91,350 for taxable year 2000 and $11,936 in legal fees associated with collecting a debt for taxable year 2000. On June 1, 1997, R&P Partnership allegedly lent $31,350 to Steinberg & Associates, Inc. (Steinberg), with an interest rate of 18 percent and a maturity date of 1 year. R&P Partnership was one of nine alleged creditors on the loan, which totaled $449,350. On September 12, 1997, R&P Partnership allegedly lent Steinberg $60,000 with an interest rate of 18 percent and a maturity date of 1 year. R&P Partnership extended the maturity date of the second note by 1 year to September 12, 1999. Both promissory notes are undated and have only the signature of the alleged debtor, not that of any notary or witness. R&P Partnership alleges that it never received a payment from Steinberg on either loan and that Steinberg defaulted on both. During 2000 Steinberg filed for bankruptcy

and listed R&P Partnership as a secured and unsecured creditor in relation to the two notes.

Investigation

The Internal Revenue Service (IRS) began investigating Mr. Reiserer and NESL in regard to promoting abusive transactions, pursuant to sections 6700 and 6701. As a result of the investigation, the IRS identified Mr. Bell as a client of Mr. Reiserer. The IRS initiated the investigation of Mr. Bell from its office in Daytona Beach, Florida, because Mr. Bell used a Daytona Beach address as his home address on his income tax returns. Mr. Bell declined the offer of the revenue agent to move the investigation to Atlanta. The Daytona Beach address on the income tax returns for taxable years 1999 and 2000 was that of a mail forwarding company. By using property records, the revenue agent discovered Mr. Bell owned a condominium in Daytona Beach. When the revenue agent went to the condominium, the person who answered the door did not know anyone by the name of Ron H. Bell.

OPINION

I. Fraud Penalty

We begin with our consideration of the issue of fraud because, absent fraud, the period of limitations may no longer be open for respondent's assessment of deficiencies in the income tax of the Bells for taxable years 1996, 1997, and 1998. See

sec. 6501(c)(1); see, e.g., Langworthy v. Commissioner, T.C. Memo. 1998-218.

In the case of the filing of a false or fraudulent return with intent to evade tax, the tax may be assessed at any time. Sec. 6501(c)(1). If the return is fraudulent in any respect, it deprives the taxpayer of the bar of the statute of limitations for that year. Lowy v. Commissioner, 288 F.2d 517, 520 (2d Cir. 1961), affg. T.C. Memo. 1960-32. "Thus where fraud is alleged and proven, respondent is free to determine a deficiency with respect to all items for the particular taxable year without regard to the period of limitations." Colestock v. Commissioner, 102 T.C. 380, 385 (1994). Moreover, if a joint return was filed, proof of the fraudulent intent as to one spouse lifts the bar of the statute of limitations as to both spouses. Vannaman v. Commissioner, 54 T.C. 1011, 1018 (1970). However, the Commissioner must show fraud clearly and convincingly as to both taxpayers on a joint return for each of them to be liable for the fraud penalty. Balot v. Commissioner, T.C. Memo. 2001-73.

The fraud penalty is a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from a taxpayer's fraud. See Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Fraud is intentional wrongdoing on the part of the taxpayer with the specific purpose

to evade a tax believed to be owing.  See <u>McGee v. Commissioner</u>, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).

The Commissioner has the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  The Commissioner's burden of proof under section 6501(c)(1) is the same as that imposed by section 6663.  See <u>Pennybaker v. Commissioner</u>, T.C. Memo. 1994-303.  To satisfy the burden of proof, the Commissioner must show:  (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  See <u>Parks v. Commissioner</u>, 94 T.C. 654, 660-661 (1990).  The Commissioner must meet this burden through affirmative evidence because fraud is never presumed.  <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 699 (1989); see also <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970).  Once the Commissioner has established by clear and convincing evidence that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.  Sec. 6663(b).

A.  <u>Underpayment</u>

An "underpayment" is generally defined (insofar as relevant to the instant case) as the amount by which the tax imposed by

the Code exceeds the amount shown as the tax by the taxpayer on his return.  See sec. 6664(a).  Respondent contends that the evidence clearly and convincingly shows that the OEL transactions lacked economic substance and that the money transferred by BCM to NESL, and later ILS, as part of those transactions was income to Mr. Bell, in the form of wages from BCM, which he failed to report on his returns.  Respondent contends that the wages were compensation for Mr. Bell's personal services.  Respondent also relies on the doctrine of constructive receipt of the funds because Mr. Bell had unfettered control over the funds.  Furthermore, respondent argues that Foxworthy should be disregarded as Mr. Bell's alter ego because it did not have a legitimate business purpose and was used as a way for Mr. Bell to claim deductions for his personal expenses and later to operate the tax deed business.  Additionally, respondent argues that the Bells fraudulently understated their income by overstating deductions.

### 1.  Economic Substance of the OEL Transactions

Mr. Bell argues that the OEL transactions in which he engaged beginning in 1996 were pursuant to a valid nonqualified "deferred compensation plan" and not done solely to avoid income tax.  Respondent argues that the OEL transactions lack economic substance and therefore should be disregarded and that the payments from BCM to NESL, and later to ILS, for Mr. Bell's

services constituted wages to Mr. Bell at the time BCM made the payments. We agree with respondent.

Income is taxed to the person who earns it and enjoys the benefit of it when paid. See Helvering v. Horst, 311 U.S. 112, 119 (1940); Corliss v. Bowers, 281 U.S. 376, 378 (1930); cf. Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 267 (1958); Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 729 (1929). Moreover, the taxpayer who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle. Lucas v. Earl, 281 U.S. 111, 115 (1930).

The economic substance of a transaction, rather than its form, controls for Federal income tax purposes. Gregory v. Helvering, 293 U.S. 465 (1935). We conclude that the OEL transactions lacked economic substance and, despite petitioners' contentions, were not made pursuant to a valid nonqualified deferred compensation plan.

Mr. Bell argues that throughout the course of the OEL transactions from 1996 through 2001 he properly deferred over $7 million of income. Moreover, Mr. Bell argues that the benefits were subject to a substantial risk of forfeiture. Mr. Bell argues that the money was sent offshore, ultimately to RHB Corp., where he did not have control over the money; instead he only recommended investments to Elfin. Furthermore, Mr. Bell argues that the OEL transactions have economic substance because the

payees of the money, NESL and ISL, were legitimate businesses that leased Mr. Bell's services to BCM. According to Mr. Bell, the OEL transactions offered him greater retirement savings over his previous Salary Reduction Simplified Employee Pension Plan (SARSEP) and to disallow the OEL plan respondent would be condemning retirement planning.

The December 1996 BCM transfer of $800,000 to NESL, was BCM's first transfer to NESL and the only such transfer made in 1996. Mr. Bell reported only $75,000 of income for that year, even though the alleged arrangement among Montrain, NESL, and BCM did not purport to take effect until December 1, 1996. From 1996 through 2000 Mr. Bell continued to report only $75,000 of wages annually. For 2001 Mr. Bell reported $37,500 in wages; the OEL transactions were terminated that year. Mr. Bell alleges that he became an employee of Montrain, an Irish corporation, that Montrain leased his services to NESL, and that NESL, in turn, leased his services to BCM. During the years in issue Mr. Bell continued to perform the same services for BCM as he had in the past. Mr. Bell did not take instructions or orders from anyone at Montrain or NESL. The documents that purport to establish Mr. Bell's employment with Montrain were not completed until November 1997, nearly a year after the purported deferred compensation plan was alleged to have taken effect and BCM's transfer of the $800,000.

Aside from a few days' delay in processing the transactions from entity to entity, Mr. Bell at all times effectively had control of and access to the funds transferred and used the funds at his discretion. The initial $800,000 transfer, less fees, was managed by Mr. Weaver in an account with Rydex Investments. The money in the Rydex Investments account was later transferred to the Rossendale/RHB Corp. Schwab account, which Mr. Bell controlled. We conclude that respondent has shown by clear and convincing evidence that, from the beginning, the money BCM transferred as part of the OEL transactions was set aside for Mr. Bell's use and was not part of any valid deferred compensation plan. Indeed, at one point, Mr. Bell complained to Mr. Reiserer of the interest he was losing as a result of the delay, and Mr. Reiserer reminded him of the immense tax savings. Mr. Reiserer's response did not satisfy Mr. Bell, and he continued to complain.

Mr. Bell argues that the OEL transactions offered him a deferred compensation plan that was payable to him at age 75. Furthermore, Mr. Bell argues that the Montrain, and later Pixley and Fitzwilliam, plans were discretionary and subject to the exclusive discretion of those entities as his employer. Mr. Bell's argument is not persuasive. Mr. Bell, by using the Rydex Investments account and later the Schwab accounts of the Nevis corporations, effectively had access to the funds a few days after BCM transferred the money.

The money transferred in the OEL transactions was ultimately used in various ways. The Bells' Northside residence, selected by the Bells, was purchased in the name of Foxworthy using funds from Helston's and Ballyclare's Schwab accounts. Mr. Bell, in collaboration with Mr. Reiserer, set up three Nevis corporations along with corresponding brokerage accounts at Schwab. The three Schwab accounts were set up at the Cobb County, Georgia, branch, the closest bank branch to BCM's office. Additionally, Mr. Bell used the signature stamp of Mr. Zarrett without his permission in order to obtain power of attorney over the funds. During the course of the OEL transactions, Mr. Bell primarily used RHB Corp. as the repository for the money transferred from BCM.

Mr. Bell, in collaboration with Mr. Reiserer, set up the purchase of Northside using the appearance of loans from Ballyclare and Helston to Foxworthy of $1,080,000 and $1,222,060, respectively. Foxworthy purchased Northside from Sam Foreman in October 1997, using a $2,110,000 wire transfer from a Schwab account in Foxworthy's name. The money in the Schwab account, however, came from Ballyclare and Helston. The money from Ballyclare and Helston came from the Schwab account in Mr. Reiserer's name. The source of the funds in the Reiserer account came from liquidating stock received pursuant to journal entry transfers from four other Schwab accounts in the names of R&P

Partnership, Ron H. Bell TTEE; Hoyt Bell Revocable Trust, Ron H. Bell TTEE; Roberta L. Bell Revocable Trust; and Kelli Bell.

Before purchasing Northside, Foxworthy had no assets. Foxworthy's address in Reno was a mail forwarding service that forwarded mail to BCM in Atlanta. Mr. and Mrs. Bell discovered Northside and visited the property before Mr. Bell instructed Foxworthy to purchase it. Although Foxworthy was the entity that, in name, purchased Northside, the homeowners insurance policy listed Mrs. Bell's maiden name, Patricia Small, for the insured. Foxworthy was listed only as an additional insured. After Northside was purchased, Mr. and Mrs. Bell moved in.

From the time Mr. Bell established the RHB Corp. Schwab account, he used the account as the main repository of the money transferred as part of the OEL transactions. Mr. Bell authorized Mr. Weaver to act under a power of attorney in order to cover up a direct link between the RHB Corp. Schwab account and himself. However, Mr. Bell maintained access to the account. Mr. Bell used the RHB Corp. account several times to fund the tax deed business that he began in 1999. After a few days offshore, the money transferred as part of the OEL transactions reverted to Mr. Bell's control.

Additionally, Mr. Bell's control and use of the funds transferred offshore is shown by his $550,000 loan to the church

he attended, the Unity Church.  The funds came from the RHB Corp. Schwab account.

> 2.  <u>Constructive Receipt of Funds Used in OEL
> Transactions</u>

Mr. Bell argues that the OEL transactions were part of a deferred compensation plan.  Mr. Bell's argument fails because, in addition to the reasons already cited, the alleged plan violates the doctrine of constructive receipt.  Section 1.451-2, Income Tax Regs., provides in pertinent part:

> (a) General rule.--Income although not actually
> reduced to a taxpayer's possession is constructively
> received by him in the taxable year during which it is
> credited to his account, set apart for him, or
> otherwise made available so that he may draw upon it at
> any time, or so that he could have drawn upon it during
> the taxable year if notice of intention to withdraw had
> been given.  However, income is not constructively
> received if the taxpayer's control of its receipt is
> subject to substantial limitations or restrictions.
> * * *

The constructive receipt doctrine requires a taxpayer who is on the cash method of accounting to recognize income when the taxpayer has an unqualified, vested right to receive immediate payment of income.  See <u>Palmer v. Commissioner</u>, T.C. Memo. 2000-228.  Under the constructive receipt doctrine, a taxpayer may not deliberately turn his back on income otherwise available.  See <u>Martin v. Commissioner</u>, 96 T.C. 814, 823 (1991).

A few days after BCM transferred money to NESL, and later to ISL, the money was wired offshore.  After a brief delay in

processing the transactions, Mr. Bell requested that the money be placed in the various Schwab accounts. All of the Schwab accounts were controlled by Mr. Bell directly, or through Mr. Weaver, who held a power of attorney on the RHB Corp. Schwab account. Additionally, Mr. Bell had access to the money in the accounts as demonstrated by loans to his church and to Foxworthy for the tax deed business. The agreement that Mr. Bell claims to have entered into with Montrain, and later Pixley and Fitzwilliam, to defer his compensation until age 75 is ineffective to prevent constructive receipt of the money because Mr. Bell had access to and control over the money shortly after BCM transferred it. Consequently, we conclude that the record clearly shows that all of the money BCM transferred as part of the OEL transactions was constructively received by Mr. Bell in the years it was transferred, and it is therefore includable in Mr. Bell's income for those years.

3. Disregard of Foxworthy as Mr. Bell's Alter Ego

Respondent argues that the Court should disregard Foxworthy and treat it as Mr. Bell's alter ego. In Moline Props., Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943), the Supreme Court stated:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or

> undisclosed convenience, so long as that purpose is the
> equivalent of business activity or is followed by the
> carrying on of business * * *, the corporation remains
> a separate taxable entity.  * * * [Fn. refs. omitted.]

Despite the general rule, however, the corporate form will be disregarded when it is determined that the corporation is a sham. Id. at 439.

Mr. Reiserer formed Foxworthy as a Nevada corporation on August 12, 1996, but until it purchased Northside during 1997 it had no assets, no liabilities, and no employees and had not issued any stock.  When the Bells decided to purchase Northside, Mr. Reiserer suggested to Mr. Bell that he use Foxworthy to hold title to Northside.  The mailing address used for Foxworthy was a mail forwarding service in Reno that Mr. Bell contends he previously had set up because of identity theft issues.

At the time of Foxworthy's formation, Mr. Reiserer was its president, and Ms. Agee, Mr. Reiserer's law firm associate, was its secretary and treasurer.  Because Foxworthy's main asset as of the end of 1997, Northside, was in Atlanta, it needed, for convenience, a local individual to sign documents.  Mr. Bell suggested Mr. Comsudes, his employee at BCM.  Mr. Comsudes never met Mr. Reiserer and was unaware of the identity of Foxworthy's shareholders.  Mr. Bell simply instructed Mr. Comsudes to sign the documents.  While he was president of Foxworthy, Mr. Comsudes had no day-to-day duties and followed Mr. Bell's instructions.

Although it was not originally formed for Mr. Bell, once Mr. Bell decided to use Foxworthy to purchase Northside, the record clearly shows that Foxworthy's separateness as a corporation became a sham that was executed by Mr. Bell as eyewash for his scheme to fraudulently underpay his taxes. By interjecting Foxworthy between himself and Northside, Mr. Bell implemented a scheme to deduct his personal living expenses.

When the corporate form did not suit Mr. Bell, he simply ignored it, as illustrated by the holding of the homeowners insurance covering Northside in his wife's maiden name because the rate was less than if it had been in Foxworthy's name. Additionally, Mr. Bell purported to negotiate a fictitious lease between BCM and Foxworthy that was allegedly to be used for office space. We conclude that the lease transaction with Northside, however, was just a device for BCM to claim additional deductions, in this instance related to the Bells' personal residence. Indeed, Mr. Graham, whose name appears on the signature line of the lease on behalf of Foxworthy, testified that he did not sign it. Mr. Graham was not authorized to sign for Foxworthy. Northside had always been zoned as residential property; and since the Bells moved in shortly after purchasing it, they have lived in Northside.

Mr. Bell devised another alleged lease between BCM and "The Whitehall Inn", which Mr. Bell testified was an assumed name for

Foxworthy. We conclude that the lease agreement for the Whitehall Inn, like the one purportedly signed by Mr. Graham, was also a sham. Mr. Comsudes was unaware of the lease agreement and the existence of the Whitehall Inn. The Whitehall Inn lease agreement is purportedly signed by Mr. Graham, whose name appears on the signature line of the lease, but he did not sign it. The leases were additional instances of Mr. Bell's use of Foxworthy, and its apparent assumed name, the Whitehall Inn, to suit his needs. Ms. Sagaert prepared invoices for rent payments that purported to reflect guests staying at Northside, but no guests ever stayed at Northside. To the contrary, Mr. Bell told out-of-town guests doing business with BCM to stay at the Waverly Inn and had Ms. Sagaert prepare false invoices to cover up these facts.

During 1998 Mr. Bell became interested in the tax deed business. Mr. Bell felt that the tax deed business was lucrative and decided to use Foxworthy to invest in the business during 1999. Mr. Bell, despite not being a board member, officer, or employee of Foxworthy, made all of the significant decisions regarding the tax deed business. In order to fund the tax deed business, Mr. Bell arranged a series of alleged loans with various parties, including the three Nevis corporations. By the end of 2001, Mr. Bell had invested nearly $9 million from the OEL transactions in the tax deed business.

Mr. Bell is a skilled businessman, and he turned the tax deed business into a profitable venture. Mr. Bell proposed to alter the terms of a loan by having Foxworthy repay the loan from RHB Corp. by October 2000, only to re-borrow the money at a higher interest rate so that Foxworthy could reduce its income. The October 2000 refinancing transaction further demonstrates the control that Mr. Bell exerted over Foxworthy, despite having no formal role with the corporation. On May 27, 1999, Mr. Bell opened a brokerage account at SunTrust Equitable under Foxworthy's name. In addition to Mr. Bell, Mr. Reiserer and Mr. Comsudes had signature authority over the account. Mr. Kallis, the account representative at SunTrust Equitable, took direction only from Mr. Bell, who identified himself to Mr. Kallis as a consultant.

During 2000 Mr. Bell replaced Mr. Comsudes as president of Foxworthy with Mr. Wilson. Before working for BCM, Mr. Wilson's experience was in special events planning. At BCM Mr. Wilson earned a salary of $30,000 overseeing computer systems and special projects. As president of Foxworthy, Mr. Wilson deferred to Mr. Bell and Mr. Reiserer, although he did consult with Mr. Bell. Mr. Wilson never had contact with Foxworthy's alleged owner, Ruritania.

During March 2000 Mr. Bell indicated to Mr. Reiserer that a bank was willing to extend a $10 million line of credit for

Foxworthy to purchase tax deeds.  Mr. Bell told Mr. Reiserer that although the bank would finance 75 percent of the money, Mr. Bell himself would have to finance the remaining 25 percent. Foxworthy's tax deed business, despite its success, was Mr. Bell's alter ego, as he made all the crucial decisions, appointed and replaced its officers, funded the business primarily through his OEL transactions money, and acted as its representative with banks.

The record clearly and convincingly demonstrates, and we so conclude, that Foxworthy was Mr. Bell's alter ego in all respects, used to avoid taxation and not for any legitimate business reasons, and is further evidence of Mr. Bell's fraudulent understatement of income.  We therefore conclude that Foxworthy, as Mr. Bell's alter ego, should be disregarded.  As a result of the disregard of Foxworthy, its gross income of $7,400,759.91, $9,627,935, and $2,421,527 for 1999 through 2001, respectively, is gross income to Mr. Bell.  Additionally, Foxworthy's claimed deductions[19] in relation to Northside and the tax deed business, if not otherwise disallowed, are allowable as deductions to Mr. and Mrs. Bell.[20]

---

[19]We decide below that, as Mr. Bell's alter ego, Foxworthy is not liable for any amounts determined by respondent in the notices of deficiency in issue.

[20]The Bells are not entitled to deductions for their living expenses including the costs of maintaining Northside, their
(continued...)

4. Overstatement of Deductions

It is well settled that a fraudulent understatement of income can result from an overstatement of deductions. Drobny v. Commissioner, 86 T.C. 1326, 1349 (1986).

BCM claimed deductions for a significant number of expenses that Mr. Bell contends are ordinary and necessary business expenses, including rent to Foxworthy. Mr. Bell, as the sole owner of BCM, reported BCM's gross income on his income tax returns as part of Schedule E. The record clearly establishes that the deductions for the payments to Foxworthy for rent are overstated and evidence of fraudulent underpayment of taxes because the payments in fact disguised personal expenses of the Bells. The rent was allegedly for Northside, Mr. and Mrs. Bell's personal residence. Petitioners contend that BCM needed more office space because it had outgrown its then-current office. However, during 1996 BCM moved to new office space. The record clearly shows that BCM did not need to rent office space from Foxworthy and that the rent payments to Foxworthy were merely a device to disguise personal expenses.

---

[20](...continued)
personal residence, except for real estate taxes, allowable pursuant to sec. 164(a)(1). We discuss such income and deductions below. See infra p. 57.

The record also clearly shows that other claimed deductions of BCM were overstated. Accordingly, we conclude that, in addition to the rent expenses claimed as deductions, the other claimed deductions for expenses of BCM were improper and were disguised personal expenses for the purpose of overstating deductions and fraudulently underpaying taxes.

During the years in issue, Mr. Bell should have reported but did not report as income any of the money transferred as part of the OEL transactions. Moreover, Mr. Bell overstated his deductions. Consequently, we hold that the record clearly and convincingly establishes that Mr. Bell underpaid his income tax for each of the years in issue.

B. Fraudulent Intent

The Commissioner must prove that a portion of the underpayment for each taxable year at issue was due to fraud. Sec. 7454(a); see also Profl. Servs. v. Commissioner, 79 T.C. 888, 930 (1982). The existence of fraud is a question of fact to be resolved from the entire record. See Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. See Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006

(1982), affd. 748 F.2d 331 (6th Cir. 1984).  A taxpayer's entire course of conduct can be indicative of fraud.  See Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105-106 (1969).  The following badges of fraud have been used to prove fraud:  (1) Understating income, (2) maintaining inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of income or assets, (5) failing to cooperate with tax authorities, (6) engaging in illegal activities, (7) an intent to mislead which may be inferred from a pattern of conduct, (8) lack of credibility of the taxpayer's testimony, (9) filing false documents, (10) failing to file tax returns, and (11) dealing in cash.  Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601.  No single factor is necessarily sufficient to establish fraud.  A combination of factors may constitute persuasive evidence of fraud.

### 1. Understating Income

As we have found above, Mr. Bell clearly understated his taxable income in each of the taxable years in issue.  Mr. Bell should have reported but did not report as wages the money BCM transferred as part of the OEL transactions for 6 consecutive years.  Additionally, both Mr. Bell's alter ego Foxworthy and BCM claimed improper deductions for Mr. Bell's disguised living expenses, including maintenance of his personal residence.  The

disallowed deductions and omitted gross income establish an understatement of Mr. Bell's taxable income for 6 consecutive years, a badge of fraud. See Hicks Co. v. Commissioner, 56 T.C. 982, 1019 (1971), affd. 470 F.2d 87 (1st Cir. 1972).

### 2. Implausible or Inconsistent Explanations of Behavior

Mr. Bell was very successful in business and had developed BCM into a firm managing 1,100 portfolios worth $280 million in aggregate market value by the end of 1995. From 1991 through 1995 Mr. Bell earned an average of $730,455 in annual wages from BCM. Pursuant to the OEL transactions, Mr. Bell claimed that he earned only $75,000 each year, excluding 2001. According to Mr. Bell, the money BCM transferred as part of the transactions, a sum in excess of $7 million, was nonqualified deferred compensation, subject to the control of Mr. Bell's alleged new employer, Montrain, and to a substantial risk of forfeiture until he reached the age of 75. Mr. Bell's argument is flatly contradicted by the record--as we found above, he exerted control over the money at every turn.

### 3. Concealment of Income or Assets

From the moment Mr. Bell entered into the OEL transactions, we conclude that his goal was to find a way to conceal the money being transferred. The web of organizations and third parties Mr. Bell and Mr. Reiserer conspired to devise clearly was an elaborate scheme designed solely for the purpose of avoiding

taxation. In addition to forming corporations allegedly located in Nevis, Mr. Bell used his alter ego Foxworthy to repatriate the money allegedly transferred to those entities. Foxworthy, allegedly owned by Ruritania, a foreign entity, was used to purchase Northside, the property in which Mr. and Mrs. Bell lived in Atlanta, a scheme clearly designed to give Foxworthy an avenue to deduct personal living expenses of the Bells. When Foxworthy purchased Northside, the Bells used Mrs. Bell's maiden name on the homeowners insurance in order to obtain a lower rate and to conceal their true ownership of Northside. Additionally, Mr. Bell insured his Rolls Royce under his name but claimed it was a Foxworthy asset. Once Mr. Bell became involved in the tax deed business and it became successful, he renegotiated alleged loans between organizations he controlled in order to lessen Foxworthy's tax burden.

Mr. Bell was aware that his involvement in many of the transactions in issue would appear "troublesome", so he frequently used third parties both with and without their permission in his attempt to conceal a link between himself and the funds and assets. Mr. Comsudes, Mr. Bell's employee at BCM, became the president of Foxworthy because Mr. Bell needed an individual in Atlanta to use as a figurehead on paper while Mr. Bell maintained control. Mr. Comsudes signed whatever documents Mr. Bell put in front of him. Later, Mr. Bell replaced Mr.

Comsudes with Mr. Wilson. Mr. Wilson admittedly had more involvement with the activities of Foxworthy than did Mr. Comsudes, but Mr. Bell still maintained control. Mr. Bell asked Mr. Graham to stay on at Northside and help maintain the home after Foxworthy purchased it. Mr. Bell used Mr. Graham's name without his knowledge as a signatory on lease documents. Mr. Graham did not sign any lease and was not authorized to do so, yet his name appears as Foxworthy's representative on two alleged leases. Additionally, Mr. Graham's name appears without his permission on Foxworthy's request for an extension to file its 1997 income tax return. Furthermore, Mr. Bell used Mr. Zarrett's signature stamp without his permission. The record clearly establishes that by the use of third party names Mr. Bell attempted to conceal the true nature of the Northside purchase and subsequent lease agreements.

### 4. An Intent To Mislead

Mr. Bell's behavior, described above, in relation to the concealment of income and assets, also indicates an intent to mislead. Additionally, when the IRS began investigating Mr. Bell, he insisted on having the investigation take place in Daytona Beach, Florida, rather than Atlanta. The Bells used a Florida address on their income tax return. When the IRS agent attempted to reach Mr. Bell in Florida, she discovered that the address used on the return was a mailbox address. Additionally,

Mr. Bell owns residential property in Florida. When the IRS agent visited the property, the person who answered the door did not know anyone by the name of Ron H. Bell. Despite his presence in Atlanta, Mr. Bell insisted that the investigation be located in Florida. We conclude that by means of such actions Mr. Bell attempted to mislead the IRS.

### 5. Filing False Documents

As previously mentioned, on March 13, 1998, Foxworthy filed a Form 7004 for taxable year 1997. The Form 7004 contains Mr. Graham's signature on the signature line; however, Mr. Graham did not sign it.

In sum, we conclude that, on the basis of the extensive record, respondent has proved by clear and convincing evidence that Mr. Bell fraudulently underpaid his Federal income taxes for the years in issue. As to Foxworthy, respondent concedes the determinations made with respect to Foxworthy in the event that we decide that Foxworthy was Mr. Bell's alter ego. As we have decided above that Foxworthy was Mr. Bell's alter ego, we need not consider the determinations made in the notice of deficiency sent to Foxworthy. On the basis of respondent's concession, we hold that Foxworthy is not liable for those determinations.

As to the fraud penalty determined against Mrs. Bell, we conclude that respondent has failed to clearly and convincingly establish any fraudulent intent by Mrs. Bell. See Katz v.

<u>Commissioner</u>, 90 T.C. 1130, 1144 (1988) (a finding of fraud based upon circumstance that creates only suspicion will not be sustained).  Consequently, we hold that Mrs. Bell is not liable for the fraud penalty.[21]

## II.  Period of Limitations

The Bells argue that respondent cannot assess the tax deficiencies respondent determined against them for taxable years 1996 through 1998 because the statutory periods of limitations have expired.

In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed at any time.  See sec. 6501(c)(1).  A fraudulent return deprives the taxpayer, and the taxpayers' spouse in the case of a joint return, of the protection of the bar of the statutory period of limitations for that year.  See <u>Badaracco v. Commissioner</u>, 464 U.S. 386, 396 (1984); <u>Lowy v. Commissioner</u>, 288 F.2d at 520; <u>Vannaman v. Commissioner</u>, 54 T.C. at 1018; see also <u>Colestock v. Commissioner</u>, 102 T.C. at 385.

We have decided above that Mr. Bell filed fraudulent income tax returns for all of the taxable years in issue.  Consequently, the period of limitations on assessment for each taxable year in issue remains open as to the Bells.

---

[21]We note that Mrs. Bell has not raised any defenses pursuant to sec. 6015(b), (c), or (f).

III. The Deficiencies Determined Against the Bells

Deductions are a matter of legislative grace, and taxpayers generally bear the burden of showing that they are entitled to any deductions claimed on their returns. Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

A taxpayer is required to maintain records that are sufficient to enable the Commissioner to determine the correct tax liability. See sec. 6001; sec. 1.6001-1(a), Income Tax Regs. In addition, the taxpayer bears the burden of substantiating the amount and purpose of the item for the claimed deduction. See Hradesky v. Commissioner, 65 T.C. 87, 90 (1975), affd. per curiam 540 F.2d 821 (5th Cir. 1976).

A. Burden of Proof

The Bells argue that respondent bears the burden of proof under section 7491(a)(1) with respect to the deficiencies in issue. In pertinent part, Rule 142(a)(1) provides, as a general rule: "The burden of proof shall be upon the petitioner". In certain circumstances, however, if the taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the proper tax liability, section 7491 places the burden of proof on the Commissioner. See sec. 7491(a)(1); Rule 142(a)(2). Credible evidence is evidence that, after critical analysis, a court would find constituted a sufficient basis for a

decision on the issue in favor of the taxpayer if no contrary
evidence were submitted.  Baker v. Commissioner, 122 T.C. 143,
168 (2004); Bernardo v. Commissioner, T.C. Memo. 2004-199, n.6.

The Bells' contention that respondent has the burden of
proof lacks merit because, for the reasons discussed throughout
the instant opinion, aside from certain of the claimed charitable
contribution deductions discussed below,[22] the Bells have not
introduced credible evidence with respect to the deficiencies in
issue.  Consequently, the burden of proof remains on the Bells, a
burden that, because of the absence of credible evidence, they
cannot sustain.  See Bernardo v. Commissioner, supra n.7; see
also Rendall v. Commissioner, 535 F.3d 1221, 1225 (10th Cir.
2008) (citing Bernardo v. Commissioner, supra), affg. T.C. Memo.
2006-174.

Additionally, section 7491(a) requires that the taxpayer
cooperate with reasonable requests by the Commissioner for
"witnesses, information, documents, meetings, and interviews".
Sec. 7491(a)(2)(B).  Aside from the disallowed charitable
contribution deductions, the Bells failed to comply with the
substantiation and record-keeping requirements necessary to shift
the burden of proof to respondent.  Consequently, for the

_____

[22]As to the disallowed charitable contribution deductions,
we decide below, on the evidence in the record, that the Bells
are entitled to some of the claimed deductions.  Therefore, as to
those deductions that we sustain on the basis of the record, we
need not determine where the burden of proof lies.

foregoing additional reasons, we hold that the Bells bear the burden of proof as to the deficiencies in issue.

B.  OEL Transactions, Foxworthy Deductions, and BCM Deductions

As discussed above with respect to respondent's fraud determinations, respondent determined a series of adjustments to the Bells' income taxes.  Most of the Bells' contentions regarding respondent's deficiency determinations are addressed above in our discussion of the fraud penalties and do not bear repeating here, except that we conclude on the record that the Bells have failed, except for the charitable contribution deductions discussed below, to prove that respondent's deficiency determinations are incorrect.  Accordingly, we uphold respondent's determinations with respect to the unreported income from the OEL transactions, Foxworthy's overstated deductions with respect to Northside, the Bells' unreported income with respect to Foxworthy's gross income, and the disallowed BCM flowthrough deductions.

We found above that Foxworthy is Mr. Bell's alter ego.  Most of Foxworthy's deductions, except the real estate ad valorem taxes paid with respect to Northside, are otherwise personal to the Bells and therefore are not deductible by the Bells.  As to those real estate ad valorem taxes, we hold that they are properly allowable deductions by the Bells pursuant to section 164(a)(1).  As to the interest deductions Foxworthy claimed for

payments on the alleged loans by Helston and Ballyclare, however, those deductions are not proper because we conclude, on the basis of the record, that the loans are a sham. The remaining disputed deductions are addressed below.

C. BCM's Bad Debt Deductions Flowing Through to the Bells

Respondent determined that the Bells are not entitled to their claimed deductions with respect to two alleged Steinberg loans. The Bells claimed a capital loss of $103,286 for taxable year 2000. The loss consists of $91,350 of unsecured notes and $11,936 in legal fees associated with collecting the alleged debts. Respondent contends that the Bells have failed to establish that the debts existed, that the R&P Partnership had bases in the alleged debts, that the alleged debts are of the type that qualifies for a deduction, that the alleged debts were paid, or that the alleged debts, if they were in fact debts, went bad during a year in issue.

Section 166(d)(1)(B) provides that, where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 1 year. Whether a debt is worthless is a factual question on which the taxpayer bears the burden of proof. Estate of Mann v. United States, 731 F.2d 267, 275 (5th Cir. 1984).

The Bells have failed to meet their burden of proof because they have not demonstrated that the alleged Steinberg loans were valid debts and that those alleged debts became worthless. The promissory notes that the Bells submitted as evidence are not dated and are signed only by the alleged debtor Steinberg, with no witness or any notary seal. Furthermore, the Bells allege that in addition to R&P Partnership there were eight creditors of Steinberg. However, there is no evidence to verify this allegation. We conclude that Mr. Bell's testimony lacks credibility and is insufficient to establish the debt and its worthlessness without further corroboration. The Court need not accept at face value a witness's testimony that is self-interested or otherwise questionable. See Archer v. Commissioner, 227 F.2d 270, 273 (5th Cir. 1955), affg. a Memorandum Opinion of this Court dated Feb. 18, 1954; Weiss v. Commissioner, 221 F.2d 152, 156 (8th Cir. 1955), affg. T.C. Memo. 1954-51; Schroeder v. Commissioner, T.C. Memo. 1986-467. We conclude that the Bells have failed to carry their burden to prove the bad debts were bona fide debts and became worthless during a year in issue. We therefore uphold respondent's determinations disallowing the $103,286 in capital losses with respect to the alleged loans.

D.  Investment Account Income

The Schwab accounts of Helston, Ballyclare and Rossendale/RHB Corp. earned investment income which the Bells failed to report.  The money in those accounts came from the OEL transactions, which we have held to be income to Mr. Bell.  Mr. Bell formed the three corporations in Nevis and set up Schwab accounts in Georgia, in the branch closest to BCM's office.  All three entities lacked a legitimate business interest. Rossendale/RHB Corp. was the primary recipient of the funds from the OEL transactions.  The funds were then used to finance the tax deed business.  Helston and Ballyclare were used to lend money for Foxworthy to purchase Northside.  Mr. Bell formed the three foreign entities because they were not subject to taxation in the United States, and Mr. Bell used them as a mechanism to repatriate the OEL funds.  Section 61 provides that gross income means all income from whatever source derived, including interest and dividends.  All of the income in the three accounts, aside from the principal amounts deposited, consists of interest or dividends.  Additionally, we note that Mr. Bell stressed to Mr. Reiserer that the speed at which the offshore money was repatriated was unacceptable because he was losing interest. Accordingly, we hold that the Bells have failed to prove that they are not liable for $8,445.10 in interest income from Helston's Schwab account in 1997, $7,469.19 in interest income

from Ballyclare's Schwab account in 1997, and $37,031, $168,287.61, $126,963.85, $96,235.40, and $141,916.42 in 1997 through 2001, respectively, from Rossendale/RHB Corp.'s Schwab account.  As found above, for 1999, $18,166.50 of the income in the Rossendale/RHB Corp. account was dividend income.

E.  Capital Gains on Liquidation of Stock

Respondent argues that the Bells must recognize $329,363.38 as gain on the sale of stock because the shares in the R&P Partnership were owned by Mr. Bell.  Mr. Bell authorized the shares in the R&P Partnership to be transferred to the Schwab account in Mr. Reiserer's name.  Once in the Reiserer account, the shares were liquidated for $2,225,181.96, with Mr. Bell authorizing the proceeds to be transferred to Rossendale's Schwab account.  The Bells argue that the liquidated shares from the Reiserer account were not Mr. Bell's and that he was merely a trustee of his father's and mother's trust accounts.  The Bells further argue that respondent has not provided an explanation for the calculation of the gain.  Mr. Bell testified that R&P Partnership was another name for himself and his wife.  The shares that came from the R&P Partnership and were transferred, first to the Reiserer account and later as liquidation proceeds to the Rossendale account, were owned by the Bells.  The shares in the Hoyt Bell account, Roberta Bell account, and Kelli Bell account were eventually transferred to Helston and Ballyclare and

used to purchase Northside. The shares in those accounts were not transferred to Rossendale as part of an alleged private annuity transaction. We conclude that the Bells have failed to establish that such a private annuity transaction in fact existed.

As to the Bells' argument regarding respondent's failure to explain the calculation of the gain, it is the Bells who bear the burden of proving that respondent's deficiency determinations are incorrect. On the issue of the capital gains on the liquidation of stock, the Bells have not met their burden of proof. Consequently, we conclude that the Bells are liable for the capital gain on the liquidation of stock of $329,363.38 because the shares were owned by Mr. Bell and sold for a gain.

F. SEC Fine

The Bells concede that the $15,000 fine against BCM was not properly deducted in 1999 as an employee business expense. The Bells argue that the remaining $30,000 was proper because, although the fines were the personal obligation of Mr. Bell, Mr. Comsudes, and Mr. Palmer, respectively, BCM was the beneficiary of the work done by the three individuals. Pursuant to section 162(f), no deduction shall be allowed for any fine or similar penalty paid to a government for the violation of any law. BCM paid the $30,000 to satisfy the SEC fines levied for violation of the Investment Advisers Act of 1940, a Federal law, arguing that

it was the beneficiary of the work done by Mr. Bell, Mr. Comsudes, and Mr. Palmer. The SEC order states that Mr. Bell, Mr. Comsudes, and Mr. Palmer aided and abetted BCM in committing violations. Therefore, we hold that BCM was not entitled to deduct $30,000 paid in fines to the SEC on behalf of Mr. Bell, Mr. Comsudes, and Mr. Palmer.[23]

G. Charitable Contribution Deductions

The Bells claimed on their returns charitable contribution deductions of $161,604, $192,377, $87,572, $139,653, and $69,386, respectively for taxable years 1996, 1997, 1998, 1999, and 2000. Respondent disallowed the charitable contribution deductions in the following amounts: $155,001 for 1996, $171,103 for 1997, $77,253 for 1998, $139,653 for 1999, and $62,915 for 2000. The contributions in 1996 and 1997 included the contribution to the foundation of shares of Northeast Investments Trust valued at $300,240 for 1996 and $202,320 for 1997. Respondent disallowed the charitable contribution deductions because Mr. Bell controls the foundation and has not demonstrated the transfer of shares took place.

Section 170(a)(1) provides that a taxpayer may deduct "any charitable contribution * * * payment of which is made within the

---

[23]Mr. Bell does not argue that the payments of the fines imposed on him, on Mr. Comsudes, and on Mr. Palmer were deductible to BCM as wages. Accordingly, we need not reach that issue.

taxable year.  A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary."

Petitioners have provided statements from R&P Partnership's Schwab account that substantiate the transfer of the shares of Northeast Investments Trust to the foundation.  The statements show the shares leaving the R&P Partnership account and the foundation's statements show the shares in the account, along with the value of the shares.  IRS Revenue Agent Wilcoxon testified that despite receiving substantiation from the Bells regarding the contributions to the foundation, she disallowed the deductions because Mr. Bell controlled the charity.  However, respondent has not cited any authority in support of his contention that merely having control over the foundation disqualifies the Bells from claiming the charitable contribution deductions for the contribution of the shares of Northeast Investors Trust to the foundation.  Although the foundation is a private foundation controlled by the Bells, control alone is not sufficient to defeat the deduction to the Bells.[24]  Control in the context of private foundations generally is an issue in determining whether a private foundation is liable for excise taxes because of self-dealing.  See sec. 4941.  Respondent,

---

[24]The foundation files Forms 990-PF, Return of Private Foundation, and the Bells do not dispute the foundation's status as a private foundation.

however, does not contend that there was any self-dealing on the part of the foundation or any other violation of the restrictions or requirements of private foundations, and the record shows none. See secs. 4940-4945. Furthermore, respondent does not challenge the tax-exempt status of the foundation.

For the years 1999 and 2000, the Bells claimed total charitable contribution deductions of $650,592. However, at trial the Bells substantiated charitable contributions of only $567,886, leaving $82,706 of unsubstantiated contributions. Consequently, we hold that the Bells are entitled to a total charitable contribution deduction of $567,886.

H. BCM Deductions

Mr. Bell, as the sole owner of BCM, reported its income on his Schedule E for each of the years in issue. BCM claimed deductions on its income tax returns for various expenses. Respondent determined that BCM overstated its deductions by $1,228,088, $1,702,817, $2,678,033, $3,195,463, $1,966,457, and $651,470 for 1996, 1997, 1998, 1999, 2000, and 2001, respectively. BCM claimed deductions of $800,000, $1,220,000, $2,225,000, $2,430,000, $1,880,000, and $425,000 for the services of Mr. Bell in 1996, 1997, 1998, 1999, 2000, and 2001, respectively. The foregoing deductions are proper deductions by BCM as wages paid to Mr. Bell pursuant to section 162(a)(1). As we have previously determined above, however, that salary is

taxable to Mr. Bell.  Aside from the wages paid to Mr. Bell, the Bells have failed to substantiate that the deductions BCM claimed are legitimate deductions.  Excepting Mr. Bell's self-serving testimony, which we do not find credible on the basis of the record, the Bells have not called witnesses or submitted documents that corroborate the claimed deductions.  See Archer v. Commissioner, 227 F.2d at 273; Weiss v. Commissioner, 221 F.2d at 156; Schroeder v. Commissioner, T.C. Memo. 1986-467. Accordingly, we hold that, except for the wages paid to Mr. Bell, BCM is not entitled to the disputed deductions disallowed in the notices of deficiency.  Consequently, we sustain respondent's determinations increasing the Bells' income by those amounts.

IV.  Negligence Penalty

As to the Bells, respondent concedes the accuracy-related penalty pursuant to section 6662 in the event the Court upholds the fraud penalty against Mr. Bell.  As we have held above, Mr. Bell is liable for the section 6663 penalty; consequently, on the basis of respondent's concession, we hold that neither of the Bells is liable for the section 6662 penalty.  Mrs. Bell is not liable for the accuracy-related penalty imposed by section 6662(a) because the underpayments are due to fraud by Mr. Bell. See sec. 6662(b); Zaban v. Commissioner, T.C. Memo. 1997-479; Aflalo v. Commissioner, T.C. Memo. 1994-596; Minter v. Commissioner, T.C. Memo. 1991-448.

## V.  Section 6651(a)(1) Addition to Tax

Respondent determined that the Bells are liable for an addition to tax under section 6651(a)(1) for 1996.  Section 6651(a)(1) imposes an addition to tax for failure to file a return by the date prescribed (determined with regard to any extension of time for filing) unless the taxpayer can establish that such failure is due to reasonable cause and not due to willful neglect.  Once the Commissioner carries his burden of production, the taxpayer has the burden of proving that the addition to tax is improper.  Rule 142(a); United States v. Boyle, 469 U.S. 241, 245 (1985).  Section 7491(c) provides that the Commissioner will bear the burden of production with respect to the liability of any individual for additions to tax and penalties.  "The Commissioner's burden of production under section 7491(c) is to produce evidence that it is appropriate to impose the relevant penalty, addition to tax, or additional amount".  Swain v. Commissioner, 118 T.C. 358, 363 (2002); see also Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Respondent has met his burden of production.

Respondent received the Bells' joint income tax return for 1996 on August 27, 1997.  Petitioners have not shown that they requested an extension.  Furthermore, the Bells' return preparer indicated that her records did not reflect that any request by the Bells for an extension had been approved.  The Bells have

shown no reasonable cause as to the late filing.  Consequently, we conclude that the Bells are liable for the section 6651(a)(1) addition to tax for 1996.

VI.  Petitioners' Motions To Supplement the Record

Petitioners filed motions in each docket to supplement the record seeking leave to submit as evidence a letter dated July 22, 2008, from the IRS on the status of the investigation of Mr. Reiserer.  Reopening the record for the submission of additional evidence lies within the discretion of the Court.  Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 331 (1971).  We will not grant a motion to reopen the record unless, among other requirements, the evidence relied on is not merely cumulative or impeaching, the evidence is material to the issues involved, and the evidence probably would change some aspect of the outcome of the case.  Butler v. Commissioner, 114 T.C. 276, 287 (2000).  Petitioners argue that it is in the interest of justice to grant their motions.  However, petitioners do not articulate why it is in the interest of justice or how the evidence would change any aspect of the outcome of the instant case.  We hold that reopening the record is not warranted.  Therefore, petitioners' motions will be denied.

In reaching all of our holdings herein, we have considered all of the arguments made by the parties, and, to the extent not

mentioned above, we conclude they are without merit, irrelevant or unnecessary to reach.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.

<u>Decisions will be entered for petitioner in docket Nos. 20725-03, 18969-04, and 14612-05</u>.

<u>Decisions will be entered under Rule 155 in docket Nos. 160-04, 601-05, 21699-05, and 24533-06</u>.